321 F.2d 840
 JOHN PROVENCE #1 WELL, Petitioner in 14,120, Hillis Well, Petitioner in No. 14,121, John B. Kline #1 Well, Petitioner in No. 14,122, G. R. Goode #1 Well, Petitioner in No. 14,123, Hoover Well, Petitioner in No. 14,124, Albert Donahoo #3 Well, Petitioner in No. 14,125, Albert Donahoo #2 Well, Petitioner in No. 14,126, Youngwood Coal Company Well, Petitioner in No. 14,127, Welty Unitized #2 Well, Petitioner in No. 14,128, J. O. Boyle and Winifred Boyle, Petitioners in No. 14,129
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 14120-14129.
 United States Court of Appeals Third Circuit.
 Argued March 18, 1963.
 Decided July 3, 1963.
 Rehearings Denied September 30, 1963.
 
 Ernest R. Dell, Pittsburgh, Pa., Reed, Smith, Shaw & McClay, Pittsburgh, Pa. (Joseph G. Robinson, Norman D. Keller, Pittsburgh, Pa., on the brief), for petitioners.
 Frank I. Michelman, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, I. Henry Kutz, Donald P. Horwitz, Attys., Department of Justice, Washington, D. C. on the brief), for respondent.
 Before HASTIE, GANEY and SMITH, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 In each of these cases, the Tax Court has decided that an agreed business arrangement for the production and marketing of natural gas from a well, in which a number of persons held fractional working interests, was such as to make the enterprise an association taxable as a corporation within the meaning of section 3797(a) (3) of the Internal Revenue Code of 1939, ch. 2, 53 Stat. 469, and the corresponding section 7701(a) (3) of the 1954 Code. 37 T.C. 376. Each case involves the taxable years from 1950 through 1956. The cases have been consolidated and for present tax purposes none is significantly different from the others.
 
 
 2
 In each case, J. O. Boyle had acquired an oil and gas lease for a particular property. He then advertised and sold to others, at a stipulated price per fractional share, working interests in each well to be drilled. In the case of John Provence #1 Well, for example, thirteen individuals acquired such fractional interests, with Boyle retaining 9/64 for himself. Each purchaser received a document entitled "Assignment of Part Interest". A typical assignment provided that Boyle assigned to the named purchaser "one sixty-fourth, (1/64) working interest in Well No. 1 to be drilled * * on the John Provence leasehold". The assignment stipulated that "no partnership is here created or intended, but tenancy in common".
 
 
 3
 Beyond the initial cost of a fractional working interest, the assignee undertook to pay, upon notice from Boyle, a proportionate share of development and production costs and agreed to forfeit his interest in the well and its production to Boyle, with limited right of reimbursement, if he should fail to make such payment.
 
 
 4
 It was also specified that Boyle "shall act as Agent/Trustee/Attorney in fact/for Assignee, with exclusive powers to sell any or all gas and oil produced from this lease, and to sign all orders and papers incident to the operation and management of the well and property". Boyle, in turn, obligated himself to make periodic distribution of the "receipts of sales less expenses" among the holders of working interests.
 
 
 5
 Sale of the well and the working interests was authorized whenever holders of fractional interests in excess of fifty per cent should so desire, with the net proceeds to be distributed ratably among the holders of working interests.
 
 
 6
 Beyond matters appearing in the formal assignments the record shows that inter vivos transfers of fractional working interests occurred from time to time, and that neither such transfers nor the death of the holder interrupted the business or necessitated any reorganization.
 
 
 7
 Boyle conducted the entire business, both the activities of development and production and the sale of gas. Proceeds of sales were deposited in his personal account. In his bookkeeping he segregated or allocated expenses and receipts so that the costs and earnings of each well appeared separately. From time to time he rendered accountings and drew checks to the holders of working interests in a particular well for their respective shares of profits earned by that well. However, there was no separate business organization for any or all of the wells in suit. There was no identification by name, telephone listing, officers or articles of association, beyond Boyle's records of allocations of costs and income among the several wells.
 
 
 8
 The Tax Court, sustaining the Commissioner, found in the details of this arrangement among co-owners for the production and sale of gas sufficient resemblance to the functioning of a corporation to justify the application of the statutes making associations taxable as corporations. We reach the same result, but without finding it necessary to evaluate all of the considerations discussed and taken into account by the Tax Court.
 
 
 9
 In enacting a statutory scheme for taxing the income of corporations, Congress has provided that the term "corporation" shall include "associations", I.R.C.1939, § 3797(a) (3); I.R.C.1954, § 7701(a) (3), but without defining "association". It has been left to the Secretary of the Treasury and the Commissioner of Internal Revenue, who administer the tax laws, to give reasonable and systematic meaning to this legislative generality through "rules for the enforcement of the Act within the permissible bounds of administrative construction". Morrissey v. Commissioner, 1935, 296 U.S. 344, 354-355, 56 S.Ct. 289, 294, 80 L.Ed. 263. The relevant regulation under the 1939 Code is rather comprehensive, stating that "the term `association' * * * includes any organization, created for the transaction of designated affairs, or the attainment of some object, which, like a corporation, continues notwithstanding that its members or participants change, and the affairs of which, like corporate affairs, are conducted by a single individual, a committee, a board, or some other group, acting in a representative capacity". Treas.Reg. 111, § 29.3797-2 (1943), restated Treas. Reg. 118, § 39.3797-2 (1953).
 
 
 10
 Beyond this, the Commissioner has been more specific in the administrative definition of "association" in the context of such joint operating agreements as are commonly executed and utilized by co-owners of oil and gas leaseholds. For taxable years between 1949 and 1960, the status of such agreements is subject to Income Tax Ruling 3930, 1948-2 Cum. Bull. 126, as supplemented by Income Tax Ruling 3948, 1949-1 Cum.Bull. 161.
 
 
 11
 Since there is no substantial question that the investors in the present case have achieved for their venture, in practice, the corporate characteristics of continuity of life, transferability of shares, and centralization of management, cf. United States v. Stierwalt, 10th Cir., 1961, 287 F.2d 855, 859-860, the crucial question under I.T. 3930 is whether their objective is that which is common to corporations, namely, joint profits. Specifically, the question is whether the associates who are parties to the agreement have created an organization whose objective is to produce and sell on their joint account, or one whose objective is limited to production, with each associate being entitled to take and sell his share of the product on his own individual account. This question frequently arises when a representative has been designated to produce and sell the mineral product on behalf of the associates. In such a case, the issue is whether the representative is irrevocably authorized to sell the product on behalf of all of the associates, or whether each associate may, at any time, revoke the representative's authority and opt to take his share of production in kind or to sell it on his individual account.
 
 
 12
 The original ruling, I.T. 3930, reads, in part, as follows:
 
 
 13
 "* * * in the case of operators' agreements in which the participants reserve the right to their shares of the oil in place (or the equivalent, i. e., the right personally to sell or direct the sale thereof for their benefit, or permit the operator to do so for them for the time being), it is held that the participants, through the partnership thus created, individually own depletable economic interests in the oil and gas in place and must report the proceeds therefrom as their income. On the contrary, where agreements irrevocably vest the operator in his representative capacity with the authority to extract and sell the mineral, there are created for income tax purposes associations taxable as corporations, which associations are the owners of the depletable economic interests in the oil and gas in place and of the income derived from operations." 1948-2 Cum.Bull. 126, 129.
 
 
 14
 The supplementary ruling, I.T. 3948, undertakes to make more precise "the limitations inherent in the distinction drawn in I.T. 3930 between revocable representative capacity * * * and collective irrevocable representative capacity. * * *" 1949-1 Cum.Bull. 161, 162. It states that "revocable representative capacity must be terminable at will" and that "discretionary authority terminable at will * * * to enter into contracts committing the principals for * * * reasonable periods of time * * not to exceed one year, will not be regarded as inconsistent with revocable representative capacity in the sense that term is used herein and in I.T. 3930". 1949-1 Cum.Bull. 161, 163.
 
 
 15
 In the context of the present case, these rulings mean that if Boyle, the representative conducting the business for all of the co-owners, had irrevocable authority to sell the oil produced, or if his authority, though revocable, included discretion to enter into marketing contracts committing the co-owners for more than a year, the enterprise must be deemed an association taxable as a corporation.
 
 
 16
 Applying this test, we find it unnecessary to resolve the dispute between the parties whether, under the law of agency, Boyle's authority to conduct the operation and sell the product was irrevocable,[1] since the record shows without dispute that no limitation was imposed upon his authority to make continuing sale contracts and that he did in fact make such contracts covering periods of more than one year. Thus, the circumstances of this case come squarely within the definitive language of I.T. 3930 and I.T. 3948. Therefore, this enterprise is taxable as a corporation unless the criteria formulated in I.T. 3930 and I.T. 3948 are themselves arbitrary and unreasonable constructions of the statute.
 
 
 17
 The obvious purpose of these rulings is to distinguish cases of earning by a group from cases in which each proprietor controls and directly receives individual earnings, albeit through a common agent. The latter situation is indicated if each individual can do as he will with a share of the gas as produced. But there is a contrary indication if the representative of several co-owners so controls marketing that the individual owner has no meaningful claim except to a distributive share of total earnings. Where management is authorized to make long-term commitments for the sale of the total production of a well, the co-owners are effectively deprived of individual power to sell or otherwise dispose of any part of the gas produced by the well.
 
 
 18
 Such reasoning makes sense. The test it produces gives effect to the business realities of each co-ownership scheme. Therefore, in general conception and in specific application to this case, I.T. 3930 and I.T. 3948 embody permissible administrative construction and application of the congressional mandate that associations be taxed as corporations.
 
 
 19
 Accordingly, the decisions of the Tax Court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 The petitioners argue that the business was conducted pursuant to a delegation of managerial authority from each co-owner to Boyle as his agent and, therefore, that Boyle's authority, like that of any other agent, was in law revocable at the pleasure of his principal. But the facts of this case make the premise of petitioners' argument questionable. It was Boyle, not the prospective assignees, who enjoyed full proprietary rights immediately before the assignments of working interests defined the future rights of the parties in the enterprise. Thus, it can reasonably be argued that the assignees never acquired any right to choose whether Boyle should or should not be manager. Rather, Boyle, having that right as sole owner, reserved it to himself when he transferred certain other rights to the assignees. The normal agency rules, applicable to delegations of power to another, seem inapplicable to such a reservation to oneself of rights that never have been surrendered