**CATAPHOTE CORPORATION OF MISSISSIPPI**

v.

**The UNITED STATES.**

**No. 103–73.**

United States Court of Claims.

May 12, 1976.

William Kalish, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, Washington, D. C., for defendant; Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, and NICHOLS and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed February 4, 1976, for judgment, moving that the court adopt, as the basis for its judgment in this case the recommended decision of Trial Judge Philip R. Miller, filed October 9, 1975, pursuant to Rule 134(h), defendant having filed no notice of intention to except thereto and plaintiff, on January 30, 1976, having withdrawn its previously filed notice of intention to except thereto. Upon consideration thereof, without oral argument, since the court agrees with the recommended decision, as hereinafter set forth,* it hereby grants defendant's motion and affirms and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover and plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE

MILLER, *Trial Judge* : Sections 531 and 532 of the Internal Revenue Code impose the accumulated earnings tax upon the accumulated taxable income of every corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Section 533 provides that the fact that the earnings and profits are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders,

Jack Rephan, Washington, D. C., atty. of record, for plaintiff; David J. Harris, Harry L. Hickson, Smith, Cohen, Ringel, Kohler, Martin & Lowe, Atlanta, Ga., and Danzansky, Dickey, Tydings, Quint & Gordon, Washington, D. C., of counsel.

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed October 9, 1975, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

unless the corporation by the preponderance of the evidence shall prove to the contrary.

The purpose of this statute has been simply put in a recent Supreme Court decision (*Ivan Allen Co. v. United States*, 422 U.S. 617, 624–25, 95 S.Ct. 2501, 2505, 45 L.Ed.2d 435 (1975)):

> Because of the disparity between the corporate tax rates and the higher gradations of the rates on individuals, a corporation may be utilized to reduce significantly its shareholders' overall tax liability by accumulating earnings beyond the reasonable needs of the business. * *
>
> In order to foreclose this possibility of using the corporation as a means of avoiding the income tax on dividends to the shareholders, every Revenue Act since the adoption of the Sixteenth Amendment in 1913 has imposed a tax upon unnecessary accumulations of corporate earnings effected for the purpose of insulating shareholders. [Footnotes omitted.]

In the application of the statute the forbidden purpose need not be the sole, dominant, controlling, or impelling motive; it is sufficient if it is one of the motives for the accumulation. *United States v. Donruss Co.*, 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1969).

Plaintiff having been subjected to the assessment and payments of such taxes in the sums of $32,217 and $19,849 for its fiscal years ended June 30, 1968 and 1969, respectively (hereinafter 1968 and 1969), it now sues for their refund.

Cataphote Corporation of Mississippi (Mississippi or plaintiff) is an affiliate of Cataphote Corporation of Ohio (Ohio). During the taxable years in issue Ohio was engaged in the manufacture and sale of glass beads, plastics, paints and other traffic control equipment. The stock of Ohio was owned almost entirely by the Searight family. William Searight, the head of the family, who in 1968 was 76 years of age, held 42 percent in his own name and proxies for 23 percent more owned by his daughter. His son, Charles Searight, held 15 percent in his own name and another 15 percent as custodian for his children. The remaining 5 percent was owned by the daughter's children. William Searight was chairman of the board and chief executive officer, while Charles was president.

At the same time Charles was sole stockholder and president of plaintiff; William, who owned no stock in plaintiff, was vice-president; and Bob J. Young, who owned no stock in either corporation but was plant accountant, purchasing agent and traffic manager for Ohio, was secretary-treasurer of plaintiff.

It was Mississippi's business or function to lease trucks from Ryder Truck Rental, Inc., of Jackson, Mississippi, a national leasing organization, under a contract for full service and maintenance by Ryder, and in turn sublease them to Ohio for the transportation of some finished merchandise from Ohio's manufacturing plant in Jackson, Mississippi (where 95 percent of its shipments originated) to its customers throughout the country, and also for the transportation of some raw materials from Ohio's suppliers to its plant. Mississippi had no employees other than its officers mentioned above, nor separate premises.

Under the prime lease Ryder provided maintenance, repairs, parts, fuel, oil, lubricants, tires, and all other operating supplies and accessories in return for a flat charge per mile with a minimum requirement of 130,000 miles use per vehicle per year. The lease was for a 3-year term with the right in either party to terminate a vehicle after 1 year. In the event of such termination by plaintiff it had the obligation to purchase the vehicle at the original value less accrued scheduled depreciation. The lease was renewed by plaintiff at 3-year intervals with new vehicles and was last renewed for the period May 1969 to 1972 when it covered six vehicles. The contemporaneous sublease from plaintiff to Ohio was substantially the same, except for the method and rate of compensation. It was not measured by the operating mileage but was either an amount equal to the minimum rail freight charges (where Ohio had the option to ship

by rail), or the lowest commodity or other commercial freight rate, whichever was smaller; and with respect to incoming shipments priced on a delivered basis, was equal to the actual freight charges allowed by the supplier.

The sublease did not prescribe the full terms of the arrangement between Ohio and Mississippi, however. Even though the truck drivers were employees of Ohio, Mississippi bore the economic burden of their wages. Plaintiff billed Ohio pursuant to the terms of the sublease but Ohio offset the billing by the amounts it had paid the truck drivers on a round-trip mileage basis and for employment taxes and insurance on the drivers. Such offsets were approximately $117,000 for 1968 and $109,000 for 1969. On the other hand, although the trucks were subleased to Ohio, Mississippi was entitled to the entire proceeds of carrying loads for third persons on the return trips. Plaintiff earned $31,371 on backhaul revenues from third persons for 1968 and $40,209 for 1969.

The sublease arrangement did not cover all of Ohio's shipping requirements but only those shipments which Mississippi chose to accept, representing about 50 percent of Ohio's needs. The election was purely up to plaintiff. If the common carrier rate for a particular trip which Mississippi was required to match was not sufficiently high to return a suitable profit to plaintiff, Ohio had to find a common carrier. On the other hand, where the commercial rates were higher, or where plaintiff was able to negotiate a return load for its own benefit to enhance its profit, it would elect to allow Ohio to use the leased equipment for that trip. Since the charge was the same whether plaintiff or a common carrier handled the load, it made no difference to Ohio as to which was used.

Charles Searight's duties in connection with plaintiff's trucking operations involved the selection of the trucking equipment to be rented from Ryder, negotiating the Ryder lease, renting additional trucks in peak season, assuring Ryder's carrying out its maintenance and repair obligations, as-

certaining which of Ohio's loads were available and deciding which ones the trucks should carry, and organizing backhauls by telephone through brokers at the destinations. Young assisted him in this regard and in addition kept the books. The line between their duties for plaintiff and for Ohio was somewhat unclear. It was sometimes difficult for either of them to know when he was working for Mississippi and when he was working for Ohio. It necessitated a legal conclusion rather than a factual determination. Indeed there is a conflict between the testimony of Charles Searight and Young, the former stating that his supervision of the drivers was in his capacity as president of Ohio and the latter understanding that his supervisory duties as subordinate to Searight were on behalf of plaintiff, rather than as traffic manager of Ohio. Furthermore, when either had to decide whether to route a particular shipment via leased trucks with drivers paid by Ohio and reimbursed by Mississippi, or by common carrier, it was obviously difficult to know when his duties for plaintiff began and those for Ohio ended.

The entire space plaintiff occupied was the one-room office on the premises of Ohio's plant, which also served as Charles Searight's and Young's office as employees of Ohio. Plaintiff paid neither rent, compensation for the use of its secretarial help, nor reimbursement for local or long distance telephone bills, although Ohio's telephone was used to negotiate the backhauls from distant destinations for plaintiff's exclusive benefit.

The amorphous nature of the relationship between the two corporations is epitomized by the fact that the sublease between Mississippi and Ohio was signed for Ohio by Charles Searight, who was president and sole stockholder of plaintiff, and for Mississippi by Young, who had no proprietary interest in plaintiff but was principally employed by Ohio.

In addition to a $60,000 annual salary from Ohio, Charles Searight received from Mississippi for 1968, $25,884 and for 1969, $43,754 in salary and deferred compensation

under pension or profit-sharing plans.[1] William Searight, his father, also received $5,040 per year as vice president of plaintiff in addition to his salary as chairman of the board and chief executive officer of Ohio. Young received from Mississippi in salary and deferred compensation $25,135 for 1968 and $25,865 for 1969. The record does not reflect Young's compensation from Ohio.

It is difficult to comprehend what business purpose of Ohio's was served by the entire arrangement with plaintiff, since the election as to the loads to be carried in the leased trucks was decided only with reference to benefit to plaintiff and Ohio was not entitled to any transportation rates lower than what it would have had to pay common carriers in any event for such loads. It is also difficult to understand what business purpose of Ohio's was served by leasing the trucks from plaintiff as a middleman rather than directly from Ryder. Plaintiff absorbed very little if any of the risks, since the amounts it owed Ryder and the net amounts Ohio owed it were necessarily correlated because both were based on actual use. Plaintiff incurred no substantial obligation to Ryder which was not at the least offset by a corresponding obligation to it from Ohio, and plaintiff could even ensure this by choosing only such of Ohio's shipments as would give it the most profitable round trip.[2] Ohio also lost the benefits of all of the backhaul revenues from third persons, while it absorbed the long-distance telephone and other administrative costs of carrying on that portion of the business. It is fair to conclude that in any arm's-length dealings Ohio could have obtained the same service from Charles Searight, its president, for far less than the approximately $250,000 in salary and net profits from trucking (after taxes) he and his wholly owned corporation earned for the 2 years, 1968 and 1969, in addition to his $120,000 in salary from Ohio.

The only reasonable inference to be drawn from these facts is that the business of Mississippi was primarily that of diverting or channeling off to Charles Searight and his wholly owned corporation additional compensation, which would otherwise not have been deductible from its income by Ohio.

The foregoing description of plaintiff's business is important. The statute allows the accumulation of earnings for the reasonable needs of the business and makes presumptively determinative of the purpose to avoid income tax with respect to the shareholder only the accumulation of earnings beyond the reasonable needs of the business. Thus, we are put to the duty of ascertaining what is the business of the taxpayer in order to determine its reasonable business needs.

For the years 1968 and 1969 plaintiff's reported net incomes from all sources were $201,362 and $116,394. Plaintiff's balance sheets per its tax returns for the years in suit (which because of the cash method of accounting do not reflect income tax liabilities of $94,970 and $35,182, respectively) show the assets, liabilities and capital and retained earnings as follows:

| Assets | 6/30/08 | 6/30/69 |
|---|---|---|
| Cash | $83,221.91 | $164,786.91 |
| Loans to stockholders | 12,000.00 | 40,000.00 |
| Mortgage and real estate loans | 37,158.63 | 36,091.56 |
| Other investments | 200,000.00 | 99,665.00 |
| Fixed assets less depreciation | 10,215.84 | 13,395.96 |
| Oil leases | 3,623.78 | 3,149.90 |
| Organization cost | 293.66 | 293.66 |
| Total Assets | $346,513.82 | $357,382.99 |
| Liabilities and Capital | | |
| Payroll taxes | $1,500.61 | $1,909.24 |
| Common stock | 9,600.00 | 19,200.00 |
| Paid in surplus | 641.66 | 641.66 |
| Retained earnings | 334,771.55 | 335,632.09 |
| Total Liabilities and Capital | $346,513.82 | $357,382.99 |

However, the retained earnings have to be increased for tax purposes to restore a capitalization of earnings by way of stock dividends which have no effect under the

---

1. The record does not reflect the amount of deferred compensation paid by Ohio.

2. While plaintiff did assume the burden of guaranteeing Ryder a minimum of 130,000 miles per truck per year, this too entailed little risk, since the amounts paid Ryder show that the trucks were operated far beyond the minimum mileage even when carrying only about half of Ohio's loads.

tax laws. Thus, the corrected figures are as follows:

| | 6/30/68 | 6/30/69 |
|---|---|---|
| Accumulated earnings and profits | $339,571.55 | $350,032.09 |

The assets in the foregoing balance sheets were almost all liquid or amounts due it from its stockholder. The "Other investments" in 1968 consisted of United States Treasury bills and certificates of deposit, and in 1969 they included also a purchase of a large amount of silver bullion on margin through a Zurich, Switzerland bank. The mortgage and real estate loans were amounts owing from Charles Searight. The fixed assets were shares of the drilling equipment used by the operators of oil and gas working interests in which plaintiff had made investments and which were imputed to plaintiff for tax depreciation purposes.

Despite the substantial accumulated earnings plaintiff made no distributions of dividends in any of the years 1965 through 1968 and only distributed $96 in 1969. In lieu thereof plaintiff made loans to its stockholder. On July 31, 1967, Mississippi lent Charles Searight $38,000 at 6 percent interest, secured by a mortgage with a 20-year term, for making home improvements and refinancing his mortgage loan. Plaintiff also made other loans to its sole shareholder without collateral, ranging in amounts from $5,000 to $140,000, for terms varying from 30 days to 6 months and at interest rates from 5 to 6½ percent. At the end of 1968 Charles Searight owed plaintiff $12,000 and at the end of 1969, $40,000; however, from October 30 to December 31, 1968, he owed plaintiff $80,000, and from December 31, 1968, until June 30, 1969, he owed plaintiff $130,000. The purpose of these loans was to enable Searight to engage in stock market speculation on his own account, to invest in oil and gas ventures and to speculate in silver futures contracts.

Plaintiff also engaged in speculative investments with surplus funds in its own name. In July 1968 it purchased 145,000 ounces of silver bullion through a Swiss bank for $332,976, at 15 percent margin, putting up $49,665 in cash. As of June 30, 1969, the market value of the silver had declined by $108,170 requiring plaintiff to put up additional margin to cover the loss. It purchased 500 shares of Occidental Petroleum common stock for $41,402 on June 9, 1967, sold 200 of the shares 14 days later at a $5 per share gain, repurchased 200 more shares on July 11 after a $3 per share decline in price, and disposed of the entire 500 shares on November 14, 1967, for $41,901. On October 25, 1967, plaintiff purchased 500 shares of Grumman stock for $15,987 and sold them on February 29, 1968, for $16,820. And, as will be discussed later, during 1968 and 1969 it invested $98,342 in fractional working interests in oil and gas drilling projects, which for the most part were wildcats.

Plaintiff contends that it accumulated its earnings to meet reasonably anticipated business needs. The first of these alleged needs was for $349,140 to pay for the cost of a fleet of ten trucks and an operational service facility. While the sum is not unreasonable as an estimate of the cost of acquiring the equipment and facilities, it is difficult to credit the testimony of Charles Searight and Bob J. Young that they had any such actual plan during those years. First, the plan to acquire the vehicles, facilities and personnel is not supported by any contemporaneous documents in existence or prepared during the taxable years at issue. Young testified that he prepared an estimate on a single scratch sheet on an unspecified date, which neither thought important enough to retain. The use of such funds in speculative fliers both by the corporation and by its stockholder with money borrowed from the corporation is also hardly consistent with the asserted purpose of preserving the accumulation as a reserve to meet anticipated business needs.

Prior to 1961 Mississippi had owned and operated three trucks, which it leased to Ohio. On the basis of that experience Charles Searight was convinced that it was not economically feasible to service them through commercial garages, or to provide the facilities and personnel to maintain them short of having at least ten vehicles in full use throughout the year. Although

since that time plaintiff had been occasionally able to use nine to ten trucks temporarily in peak seasons, it was never able to stabilize its shipping volume at the ten-truck level. Even as of May 1969, one month before the end of the fiscal year, when plaintiff made its last lease renewal from Ryder for 3 more years, plaintiff would not take the risk of leasing more than six vehicles to furnish to Ohio on a year-round basis. It can hardly be concluded that at or about that time plaintiff seriously considered putting out $349,140 to purchase ten vehicles and a service facility and to hire the trained service personnel to go with it.

Charles Searight testified that a reason for the accumulation for the proposed purchase was that plaintiff's increased profits for 1968 and 1969 raised the probability that Ohio would refuse to renew its lease unless it obtained more favorable rates from plaintiff. This is inconsistent with the fact that in May 1969 Ohio renewed its lease for 3 years on the same terms without any reduction in rates. Furthermore, there is lacking any correlation between a proposed rate reduction and the need to purchase the equipment. There was ample room in plaintiff's profits to enable it to reduce its shipping rates to Ohio and still continue to lease the trucks from Ryder. There is no evidence of any study or analysis which convinced plaintiff that it needed to purchase and service the equipment it furnished Ohio in order to be able to charge the latter less than if it continued to lease the equipment from Ryder under a full-service contract.

It is apparent that the extent of plaintiff's profits was not a factor in Ohio's willingness to enter into the sublease. The sublease could not by any stretch of the imagination be termed one that was either negotiated at arm's length, or served some business purpose of Ohio. Thereunder, Ohio not only paid the same common carrier rates it would have paid in any event for its shipments, but in addition it bore the cost of supervision of the truck drivers, advanced their wages and furnished Mississippi free clerical personnel, free premises, free long-distance telephone and other facilities. It did not even result in the economy to Ohio of eliminating the need for its own traffic department, since plaintiff only took the shipments which were profitable to itself. If the financial benefit of the arrangement to Mississippi and the lack of benefit to itself was of no concern to Ohio before the end of 1969, and if it did not object to its renewal for 3 more years in May 1969, what reason did plaintiff have to believe that Ohio was on the verge of terminating the arrangement in 1968, 1969, or shortly thereafter? Finally, William Searight, who held the controlling interest in Ohio, testified that apart from the objections of possible merger candidates, Ohio was perfectly satisfied with the existing subleasing arrangement and had no intention of canceling it absent a merger with an unrelated party.

Charles Searight also claimed that he needed the $349,140 accumulation to purchase the trucks and facilities because it was increasingly obvious to him in 1969 that Ohio would be merged with another company and that the other company would insist on terminating the middleman sublease arrangement, which plaintiff found so profitable. Several merger candidates had already insisted that the trucking operations be included in the merger. But if absent the merger there was no reason for plaintiff to accumulate the funds to buy the trucks, there was even less need for the accumulation to buy the trucks in contemplation of the merger. If to an independent merger candidate the truck-sublease arrangement could not be justified as serving Ohio's business purposes, it was explainable only as a device for the reallocation or diversion of profits among family members. After the merger the Searights would continue their interests as stockholders in the merged company. Indeed, after the 1972 merger with Ferro Corporation, Charles Searight also retained his managerial role as vice president and general manager of the Cataphote Division of Ferro. It is fair to infer that this was one of the things for

which the owners of Ohio bargained, or at least for which Charles Searight hoped. It was utterly unreasonable to expect that the merged company (and particularly a publicly owned one) would allow a substantial stockholder and officer to continue to make profits in dealing with himself in an obvious conflict-of-interest situation, whether he leased the trucks or owned them.

Even apart from the conflict-of-interest problem Mississippi had little or nothing to offer to an independent company. Its two officers were already employees of Ohio and there is no evidence that they had any intention of leaving voluntarily after the merger. Plaintiff had no other operating or service personnel with skills or know-how valuable to the merging company. Even if it purchased the ten trucks and a small service facility plaintiff believed a minimum prerequisite for a successful operation, plaintiff offered no evidence that it had reason to believe the merging company would have any need for that many vehicles when neither Mississippi nor Ohio could use them profitably. And, equally important, plaintiff offered no evidence that it believed or had a reasonable basis for assuming that it could compete with a national leasing organization in purchasing, financing and providing full service for vehicles on a national basis even if it contributed the interest value of the relatively minor additional working capital used in its business (discussed, *infra*).

If the new company declined to enter into such a lease with Mississippi plaintiff would have had no use for the trucks and facilities it would own, since it had no certificate of convenience and necessity, and since in Charles Searight's view the location was not economically desirable for an independent trucking business. Under the circumstances plaintiff could hardly have planned investing $349,140 in new vehicles and facilities for which its use was highly problematic.

Plaintiff's May 1969 renewal of the Ryder lease and the sublease for another 3-year period, despite Ohio's plans for a merger is not consistent with an intention by plaintiff to purchase its own trucks and facilities at least through 1972. The fact is also that plaintiff has never purchased any trucks or constructed a service facility, and there is no explanation in the record as to any change in circumstances which resulted in the change in the alleged plans. "The more extended continuity is enlightening, and we see no reason to draw the curtain against parts of it." *Maytag v. United States,* 289 F.2d 647, 650, 153 Ct.Cl. 622, 628 (1961).[3]

All businesses face contingencies in varying degrees and probabilities, and if one thinks hard enough it is always possible to conjure up a contingency which will justify an accumulation however large. But so broad an interpretation of "the reasonable needs of the business" would obviously nullify the operation of the statute. In the enactment of the Internal Revenue Code of 1954 (sec. 537) Congress broadened the definition of reasonable needs to include the "reasonably anticipated needs" of the business. However, the committee sponsoring the measure cautioned that the plans for using the accumulation must be specific and definite, rather than uncertain or vague, to render the tax inapplicable:

> It is contemplated that this amendment will cover the case where the taxpayer has specific and definite plans for acquisition of buildings or equipment for use in the business. It would not apply where the future plans are vague and indefinite, or where execution of the plans is postponed indefinitely. [S.Rep.No.1622, 83rd

---

3. *See also* S.Rep.No.1622 on Internal Revenue Code of 1954, 83rd Cong. 2d Sess. 69–70 (3 U.S.C. Cong. & Adm.News 1954, p. 4701):

"If the retention of earnings is justified as of the close of the taxable year, subsequent events should not be used for the purpose of showing that the retention was unreasonable in such

year. However, subsequent events may be considered to determine whether the corporation actually intended to consummate the plans for which the earnings were accumulated."
Section 1.537–1(b)(2) of the Treasury Regulations reiterates the same language.

Cong.2d Sess. 69; 3 U.S.C. Cong. & Adm. News 1954, p. 4701.]

and

In any case where there exists a definite plan for the investment of earnings and profits, such corporation need not necessarily consummate these plans in a relatively short period after the close of the taxable year. However, where the future needs of the business are uncertain or vague, or the plans for the future use of the accumulations are indefinite, the amendment does not prevent application of the accumulated earnings tax. [H.Rep.No.1337, 83rd Cong. 2d Sess. A 173; 3 U.S.C. Cong. & Adm.News 1954, p. 4312.]

Taking its cue from the committee reports, Treasury Regulations section 1.537–1(b)(1) similarly states that to justify an accumulation, plans for its future use must be "specific, definite, and feasible" rather than "uncertain or vague."

As the court stated in *Bahan Textile Machinery Co. v. United States,* 453 F.2d 1100, 1102 (4th Cir. 1972):

It is no excuse to say, as Taxpayer does, that the alleged future plans lacked specificity because it was a small, informally-conducted corporation and that "every time Edward F. Bahan sat at his desk, the Board of Directors was in session." The specificity requirements were written into the regulations by the Commissioner precisely because a loosely run corporation like the appellant presents a high potential for post hoc, unsupported rationalizations for the prohibited hoarding of profits.

And *see also Estate of Goodall v. Commissioner,* 391 F.2d 775, 799 (8th Cir. 1968), quoting with approval from *Smoot Sand & Gravel Corp. v. Commissioner,* 241 F.2d 197, 202 (4th Cir.), *cert. denied,* 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957): "The intention claimed must be manifested by some contemporaneous course of conduct directed toward the claimed purpose."; *Dixie, Inc. v. Commissioner,* 277 F.2d 526, 528 (2d Cir.), *cert. denied,* 364 U.S. 827, 81 S.Ct. 62, 5 L.Ed.2d 54 (1960): It is not sufficient to "recognize a future problem and discuss possible and alternative solutions. * * * Definiteness of plan coupled with action taken toward its consummation are essentials."

On the basis of the evidence it must be concluded that at most the purchase of vehicles and facilities was merely a possibility discussed over a period of years but not ever found to be sufficiently feasible or warranted so that plaintiff actually accumulated its earnings for that purpose.

Plaintiff also claimed a need for the accumulation of about $100,000 for working capital needs of the existing business. Since Ohio paid plaintiff only as its customers paid for their merchandise and shipping, plaintiff extended credit to Ohio for up to 4 months. On the other hand, plaintiff's payments to Ryder were due 10 days after monthly billing from Ryder for mileage operated during the prior month. To the extent that the payment of expenses may be postponed as a result of credit arrangements, the need for operating capital is reduced. *See W. L. Mead, Inc. v. Commissioner,* P–H Mem. T.C. ¶ 75,215 (1975); *Kingsbury Investments, Inc. v. Commissioner,* 28 TCM 1082, 1088–89 (1969), and B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders 8–16 (3rd. ed. 1971). Taking into account the 15-day average delay implicit in monthly billing, the time needed to prepare and mail the bills plus the 10 days to respond, it is reasonable to conclude plaintiff had 30 days credit on its payables to Ryder to offset partially the delays in the collection of its own receivables.

On the basis of the evidence it is concluded that for each of the years 1968 and 1969 plaintiff's trucking operations required approximately $45,000 in working capital to cover vehicle lease costs, rental of additional trucks during peak months, tolls, salaries of its two officers, insurance and legal and audit fees. This is based on application of the so-called *Bardahl* method or formula (*Bardahl Manufacturing Corp. v. Commissioner,* 24 TCM 1030 (1965). A synopsis of

the method is set forth in B. Bittker and J. Eustice, *supra,* at 8–15 to 16, as follows:

The operating-cycle test, first enunciated by the Tax Court in the *Bardahl* case in 1965 and refined by later decisions, permits accumulations of current earnings to cover reasonably anticipated costs of operating a business for a single operating cycle. The length of the cycle is the period during which money is tied up in inventory or accounts receivable, and hence is unavailable for dividend distributions by the company. This cycle may be described as the time needed to convert cash into raw materials, raw materials into finished goods, inventory into sales and accounts receivable, and any accounts receivable into cash.[4]

The following computation is in accord with the *Bardahl* formula as generally applied by the parties to the facts of this case, but is modified as explained in the footnotes:

| *The Accounts Receivable or Collection Cycle* | 1968 | 1969 |
|---|---|---|
| 1. Yearly revenues | [1]$630,169 | [1]$581,140 |
| 2. Accounts Receivable—Beginning of year | −110,413 | [2]−98,887 |
| 3. —End of year | [2]+98,887 | [3]+74,205 |
| 4. Yearly revenues restated on accrual basis | 618,643 | 556,458 |
| 5. Peak Accounts Receivable | 147,932 | 115,740 |
| 6. Peak Receivables cycle as percentage of annual total (line 5 divided by line 4) | 23.91% | 20.80% |
| 7. Peak Receivables cycle expressed in days of year | 87 | 76 |
| 8. Days in peak Receivables cycle as percent of year (line 7 divided by 365) | 23.91% | 20.80% |
| *Working Capital Needed to Pay Truck Rentals And Other Payables During Peak Receivables Cycle* | | |
| 9. Annual truck rentals | $214,126 | $246,400 |
| 10. Average Payables cycle for truck rentals (30 days) as percentage of year | [3]8.33% | [3]8.33% |
| 11. Difference between peak Receivables cycle and truck rentals Payable cycle, as percent of year (line 8 minus line 10) | 15.58% | 12.47% |
| 12. Working Capital needed to pay truck rentals for one peak Receivables cycle (line 9 times line 11) | $33,361 | $30,726 |
| 13. Compensation-Officers | [4]34,378 | [4]34,284 |
| 14. Pension | 7,310 | 13,875 |
| 15. Other Payables | 6,638 | 11,194 |
| 16. Total | 48,326 | 59,353 |
| 17. Working Capital needed to pay other expenses during one peak Receivables cycle (line 16 times line 8) | 11,555 | 12,345 |
| 18. Total Working Capital requirements during peak Receivables cycle (line 12 plus line 17) | $44,916 | $43,071 |

[1] Mississippi income tax returns for fiscal year 1968 reported gross receipts of $512,861 and for fiscal year 1969, $471,651. However, the tax returns were not reported in the same manner as the accounts were kept. The tax returns reported only cash received. The accounts show that Mississippi's gross billings to Ohio were not paid wholly in cash. Payments were also made by way of offsets to truck drivers' wages and related expenses paid by Ohio in the sums of $117,308 in 1968 and $109,489 in 1969. Inasmuch as the agreed peak receivables used by both parties in their computations are based on peak gross billings, determination of the collection cycle must likewise be made by comparison with annual gross billings Accordingly, the $117,308 and $109,489 have been added back to the sales figures plaintiff stated on its income tax returns.

[2] Includes addition of $26,400 not yet received by Mississippi at end of fiscal year 1968, although carried as paid June 25, 1968, on Ohio's records. For fiscal year 1969 the additional amount of $10,000 was included as accrued by Mississippi from June 25, 1969 billing in the amount of $19,011

[3] Since neither party offered evidence of peak payables, average payables are used here and only with respect to amounts due Ryder.

[4] Agreed upon salary expenses of $48,709 in fiscal year 1968 and $60,784 in fiscal year 1969 have been reduced by bonuses paid over and above basic compensation, amounting to $14,331 in fiscal year 1968 and $26,500 in fiscal year 1969. Inasmuch as these year-end payments are based on profits and are not considered to be a cyclical expense in computing necessary working capital.

Plaintiff contends further that it was in the oil and gas business and for that business as of the end of 1968 it required $201,588 and as of the end of 1969 it required $62,249 in reserves and operating capital. The facts are that during the 2-year period plaintiff invested $98,342 in 26 separate fractional minority working interests in oil and gas drilling ventures in Mississippi. Charles Searight was originally drawn to such investments as a tax shelter, starting with 1/128 and 1/64 working interests. After he let it be known he was in the market for further opportunities, various independent oil operators and promoters would solicit his financial participation in their projects. Beginning in 1964 he initiated the plaintiff corporation into the acquisition of such interests. Thereafter, whether he personally or the corporation made the investment depended on which had the available funds at the time a promoter sold him on an operation.

A typical form agreement between the oil producer and plaintiff provided that the producer assigned to plaintiff a 1/16 (or other fractional undivided) interest in a lease and the promoter agreed to commence or cause to be commenced by a stated date drilling operations for a test well on the property at his own cost, risk, expense and liability to a preset contract depth and to make appropriate tests for oil and gas. In return plaintiff agreed to pay $1,800 (or other fixed sum) to the producer. After the test well was drilled to contract depth, electric logged and side-wall cored by the producer, each party was to have a 24-hour period in which to agree or decline to participate in the cost of completion of the well. An agreement as to costs of completion was then made in which payments were due in the same proportion. If plaintiff declined further participation, his interest was to be assigned to other parties electing to complete the well. The producer was to be in charge at all

4. And see also *Apollo Industries, Inc. v. Commissioner,* 358 F.2d 867, 871–72 (1st Cir. 1966), and *W. L. Mead, Inc. v. Commissioner, supra.*

times, but plaintiff was to have the right of access to inspect the work and to witness tests. The producer agreed to indemnify and to hold plaintiff harmless from all claims and demands resulting from the drilling other than the amount it had agreed to. The agreement expressly stated that it should not be construed as creating a partnership or joint venture. Of the 26 prospects drilled in the 2 years at issue, plaintiff's financial participation in 14 was limited to a ⅟₁₆ interest, in two to a ⅛ interest, and in one to a ¼ interest. The record does not disclose the extent of plaintiff's share in the nine others. Twenty-one of the 26 involved an initial commitment by plaintiff of $3,000 or less, one as little as $700. Most of the wells were wildcats.

Plaintiff's participation involved only the activity of Charles Searight, Bob Young having little or nothing to do with it except to keep plaintiff's books. Searight's activities included the evaluation of the promoters' offerings, the initial decisions on whether or not to make investments in projects, the receipt and evaluation of drilling reports and of the operators' advice on whether to continue or to abandon or forfeit after the initial drillings, and decisions with respect to the investment of additional capital for deeper drilling and additional test wells. If a well had a possibility of commercial production, he had to decide on whether or not to put up additional proportionate funds for casing or pipe and for additional development wells on the same tract to exploit the deposit. Searight had no expert geological training and employed no geologist but relied on the advice of the particular operator or of other promoters with whom he dealt and he occasionally consulted friends in the oil and gas business. Mr. James Furrh, who promoted a number of the projects, testified that Searight was usually too busy to go out and visit the wells in which plaintiff invested but did receive and read the operators' reports. Neither Searight nor plaintiff engaged in any of the actual operations of well drilling, contracting for drilling, testing, employing or supervising workmen, purchasing materials or selling petroleum.

In addition to the operator indemnifying plaintiff against claims and demands in excess of its original commitment he usually also provided general public liability insurance for drilling hazards up to a specified amount. Plaintiff purchased excess liability insurance to cover catastrophic liability beyond that.

Investment in securities of companies which are unrelated to the activities of the business of a taxpayer corporation may be evidence of an accumulation of earnings beyond the reasonable needs of the business. *Helvering v. Chicago Stock Yards Co.*, 318 U.S. 693, 701, 63 S.Ct. 843, 87 L.Ed. 1086 (1943); *Helvering v. National Grocery Co.*, 304 U.S. 282, 291–92, 58 S.Ct. 932, 82 L.Ed. 1346 (1938); Treas.Regs. § 1.537(2)(c). For purposes of the accumulated earnings tax, a taxpayer does not become engaged in the business of an unrelated corporation merely by acquiring a minority stock interest therein. Treas.Regs. § 1.537–3. Similar provisions have existed in every regulation on income taxes since Treasury Regulations 45, Article 352, under the Revenue Act of 1918. And the same has been held with respect to a corporation acquiring a fractional limited partnership interest in another business. *Turner v. Commissioner*, 24 TCM 544, 558 (1965).

Similarly the acquisition of a fractional working interest in an oil or gas venture does not necessarily place one in the oil or gas business. *Kerr-Cochran, Inc. v. Commissioner*, 253 F.2d 121, 128 (8th Cir. 1958), *affirming* 14 TCM 304, 311 (1955); *Kerr-Cochran, Inc. v. Commissioner*, 30 T.C. 69, 80–82 (1958). The line to be drawn between the ownership of a working interest which is equivalent to being in the oil and gas business and one which is akin to a mere corporate stock investment depends upon the magnitude of the interest and whether or not the owner also has direct operating and management responsibilities. *Cf. Nemours Corp. v. Commissioner*, 38 T.C. 585, 601 n. 3 (1962), *affirmed per curiam*, 325 F.2d 559 (3rd Cir. 1963) and *John Provence # 1 Well v. Commissioner*, 321 F.2d

840 (3rd Cir. 1963). Plaintiff had no such responsibilities here.

■ On the basis of all of the evidence it is concluded that plaintiff's participation by minority interests in drilling ventures was not a part of its business but merely a series of investments or speculations unrelated to its business. It had no personnel engaged in the operation of such businesses and it did nothing to manage or operate them. In view of Charles Searight's other duties and responsibilities as president of Ohio plus his duties and responsibilities as president of Mississippi to provide trucks for Ohio's shipments, it would be remarkable if he also found time to engage in the operations of 26 other separate businesses involved in oil exploration, well drilling and production. His activities with respect to the latter amounted to no more than checking on his investments and making decisions on whether or not to make initial and additional investments or to dispose of them. This is not very different from the decisions that one has to make in investing in stocks or commodities on margin. For purposes of the tax laws "investing is not a trade or business." *Whipple v. Commissioner*, 373 U.S. 193, 202, 83 S.Ct. 1168, 1174, 10 L.Ed.2d 288 (1963).

■ While the making of investments is not necessarily inconsistent with the retention of earnings to meet anticipated needs of the business, investing in minority interests in other businesses is not a business need in itself which can justify the accumulation of earnings. If this were not so, an obvious method of avoiding the tax would be available to everyone, *i. e.*, merely by investing liquid assets in stocks. *Ivan Allen Co. v. United States*, 422 U.S. 617, 629–30, 95 S.Ct. 2501, 45 L.Ed.2d 435 (1975); *Oyster Shell Products Corp. v. Commissioner*, 313 F.2d 449, 454 (2d Cir. 1963). All excess earnings are invested in one form or another, even when they are in the form of bonds or in bank deposits bearing interest.

■ As of June 30, 1968, plaintiff's accumulated earnings and profits were $339,572. At that time the reasonable needs for accumulations in plaintiff's business were not in excess of $139,970, consisting of—

(a) Accrued and unpaid income taxes, $94,970;

(b) Working capital, about $45,000.

Thus plaintiff allowed its earnings and profits to accumulate beyond the reasonable needs of its business.[5]

As of June 30, 1969, plaintiff's accumulated earnings and profits were $350,032. As a result of the decline in value of plaintiff's investment in silver bullion by $108,170, the net accumulated earnings and profits available for use in its business were as a matter of economic reality reduced to $241,862. *Ivan Allen Co. v. United States, supra*. At that time the reasonable needs for accumulations in plaintiff's business were not in excess of $80,182, consisting of—

(a) Accrued and unpaid income taxes, $35,182;

(b) Working capital, about $45,000.

Thus plaintiff allowed its earnings and profits to accumulate beyond the reasonable needs of its business.[6]

■ In addition to the fact of the accumulation beyond the reasonable needs of the business which both logic and the statute make presumptively determinative of the purpose to avoid the income tax with respect to its shareholder, there is other evidence of such purpose. There is the almost complete absence of cash dividends, and coupled with it are substantial loans to the stockholder for his personal and speculative needs. As the Court noted in *Helvering v. National Grocery Co.*, 304 U.S. 282, 293–94, 58 S.Ct. 932, 82 L.Ed. 1346 (1938) (quoting from Judge Learned Hand in *United Business Corp. v. Commissioner*, 62 F.2d 754, 755 (2d Cir. 1933)), "These loans

---

**5.** This conclusion would not be changed even if plaintiff were deemed to have been in the oil and gas business, as plaintiff's needs for such activities were in any event not sufficient to require the excess accumulation.

**6.** *See* n. 5, *supra*.

are incompatible with a purpose to strengthen the financial position of the [corporation], but entirely accord with a desire to get the equivalent of [the controlling stockholder's] dividends under another guise." And see also *Oyster Shell Products Corp. v. Commissioner, supra.*

It is also pertinent that Charles Searight avoided substantial amounts of federal income tax by having his corporation accumulate rather than distribute its earnings during the 2 years in issue. *Helvering v. National Grocery Co., supra; American Metal Products Corp. v. Commissioner,* 287 F.2d 860, 865 (8th Cir. 1961). For 1968 his return showed taxable income of $50,023. Had plaintiff distributed the income available for dividends out of the earnings for that year he would have received an additional $106,392. This would have resulted in his having to pay additional personal federal income tax of $69,317. For the year 1969 his reported personal taxable income was $51,649. Had plaintiff's available earnings for that year been distributed he would have had an additional $65,616 in income and this would have resulted in an additional $41,574 in taxes.

It must therefore be concluded that plaintiff was availed of for the purpose of avoiding income taxes with respect to its sole shareholder by permitting its earnings and profits to accumulate instead of being distributed in 1968 and 1969, and that the determination to that effect by the Commissioner of Internal Revenue is correct.

 Another issue still remains. For the years in suit section 51(a)(1)(B) of the Internal Revenue Code levied a tax surcharge on the income of every corporation equal to 10 percent of the "adjusted tax". Subsection (b) defines "adjusted tax" as the "tax imposed by this chapter for such taxable year" with certain omissions. Plaintiff contends that the accumulated earnings tax is not within the term "adjusted tax" and that therefore the base for the 10 percent surcharge does not include the accumulated earnings tax.

"This chapter" to which section 52(b) refers is chapter 1, entitled "Normal Taxes and Surtaxes." It encompasses sections 1 through 1388 of the Code. The accumulated earnings tax is imposed by section 531, which is of course included in chapter 1. Section 531 provides that "In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income * * * of every corporation * * * an accumulated earnings tax * * * ." Thus the accumulated earnings tax fits literally the definition in section 51(b).

Plaintiff's argument that the accumulated earnings tax is in the nature of a penalty or addition to the tax does not avoid the literal language of the statute. The tax surcharge was purely a revenue-raising measure equivalent to raising the rates on each category of tax in chapter 1. There is nothing to show that Congress intended to exempt this particular portion of the tax imposed by chapter 1.

In addition, there is language in the legislative history which shows that Congress did give its attention to the problem and specifically intended that the surcharge apply to the accumulated earnings tax. The surcharge did not appear in the original committee reports. It was first proposed and adopted on the floor of the Senate. As a result, on June 10, 1968, the Conference Committee found it necessary to make a general explanation of its report to the members of Congress. The pertinent portion of this Conference Committee statement is as follows (Explanation of H.R. 15414, 90th Cong., 2nd Sess., Revenue and Expenditure Control Act of 1968, 114 Cong. Rec. 17,993 (1968)):

The surcharge, as previously explained, is a percent of the amount of the income taxes (without regard to additions to tax or penalties) imposed by chapter 1 of the code with certain adjustments. With the exception of certain items, noted below, *the surcharge* applies with respect to all taxes imposed by chapter 1. For example, the surcharge applies with respect to the tax on capital gains (but not in the partial tax computation necessary to de-

termine if the alternate capital gains tax is applicable); it *also applies with respect to the tax on accumulated earnings of corporations*, to the personal holding company income tax, etc. [Emphasis supplied.]

 In addition, defendant asserts that plaintiff is barred from raising this contention because it failed to include it in any claim for refund. The first time the contention appears is in plaintiff's brief. This defense must likewise be upheld. (*Alexander Proudfoot Co. v. United States*, 454 F.2d 1379, 197 Ct.Cl. 219 (1972); *Estate of McCabe v. United States*, 475 F.2d 1142, 1144, 201 Ct.Cl. 243, 246 (1973); *Armstrong Rubber Co. v. United States*, Ct.Cl.No.374–74, order filed Aug. 1, 1975).

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and its petition is therefore dismissed.