EMI CORPORATION, AN ILLINOIS CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentEMI Corp. v. CommissionerDocket No. 1163-81.United States Tax CourtT.C. Memo 1985-386; 1985 Tax Ct. Memo LEXIS 248; 50 T.C.M. (CCH) 569; T.C.M. (RIA) 85386; July 31, 1985. Leslie R. Bishop,Robert A. Hall, and Leonard S. DeFranco, for the petitioner. Thomas E. Ritter, for the respondent. PARKERMEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's corporate income tax of $41,600.72, $49,041.66, and $104,576.55 for its respective fiscal years ending August 31, 1975, August 31, 1976, and August 31, 1977. The sole issue for decision*252 is whether, under section 532(a), 1 petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders, by permitting its earnings and profits to accumulate instead of being divided or distributed so that petitioner is therefore subject to the accumulated earnings tax imposed by section 531. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner, an Illinois corporation, had its principal place of business in Des Plaines, Illinois, at the time it filed its petition in this case. Petitioner keeps its books and records and reports its income on a fiscal year basis ending August 31. Petitioner uses the completed contract method of reporting income within the meaning of section 1.451-3(d)(1), Income Tax Regs. Petitioner timely filed its fiscal 1975, 1976, and 1977 corporate income tax returns*253 (Forms 1120) with the Internal Revenue Service. Petitioner was organized in 1957 by Edward J. Loew to provide consultation services in the field of industrial extraction and processing of vegetable and animal products. Loew, a chemical engineer, had extensive experience in the extraction of vegetable oils. In organizing and operating his company, Loew followed a very conservative business philosophy and tried to protect against all foreseeable risks and to avoid getting over his head financially. Loew had began the business with a capital investment of only two to four thousand dollars, and slowly built up the business over the years. Around 1960, Edward D. Milligan, Arnold M. Gavin, and Ralph W. Berger--all of whom were chemical engineers--began working for petitioner. Milligan's experience, like Loew's was primarily in oil extraction. Gavin and Berger were experienced in oil refining and related fats and oils technologies. By 1970, all three were shareholders in petitioner. Originally, petitioner was simply a consulting firm, observing and recommending changes for its clients' plant operations. Throughout the early 1960's, the scope of petitioner's business grew to include*254 the acquisition and resale of equipment to clients. By the late 1960's, petitioner had begun to design and engineer entire processing plants, including purchasing, storing, and shipping the equipment to be installed in such plants. Petitioner sometimes supervised construction, testing, and placing into operation of the plants. By 1970, petitioner was completely owned and run by Loew, Milligan, Gavin, and Berger. These four individuals owned the following percentages of petitioner's stock and held the following positions in petitioner: PercentageIndividualOwnershipPositionsLoew60%President, DirectorMilligan13-1/3%Vice-President, DirectorGavin13-1/3%Vice-President, Secretary, DirectorBerger13-1/3%Vice-President, Treasurer, DirectorOn September 1, 1970, petitioner and its shareholders entered into a stock purchase agreement. Under this agreement, the shareholders were required to offer their shares for sale only to petitioner, and petitioner was required to purchase all shares so offered. The agreement also provided that the corporation would redeem all of the shares of a stockholder who had died, retired, become disabled, or*255 left petitioner's employ. The selling price of any stock so purchased was based upon the book value of the shares--100 percent of book value in the event of death or disability, and 90 percent of book value in the event of retirement, severance of employment, or sale pursuant to an offer. The agreement defined book value as "the total assets of the Corporation (not including any value for goodwill, patents, trademarks, licensing agreements or contracts) less total liabilities of the Corporation, computed on the accrual basis of accounting . . . in accordance with generally accepted accounting principles." [Emphasis supplied.] Book value was to be conclusively determined in an audit by an independent Certified Public Accountant. At the time of the stock purchase agreement, Loew was 59 years of age, Milligan 45, Gavin 47, and Berger 50. From 1970 through the years in issue, petitioner specialized in designing and providing equipment and materials for the construction of plants to extract and process oil from various vegetable and animal raw materials. Each of petitioner's contracts had varying specifications and work to be performed. Petitioner's basic contract would be*256 to provide the design of the facility and the materials and equipment necessary to complete the design.Each plant was essentially a custom-designed plant. Sometimes, petitioner would have to design and provide the superstructure for the customer's facility. In certain cases, petitioner was requested to provide on-site engineering services during the construction of the plant, and on-site inspection of the equipment once construction was completed. Occasionally, petitioner was requested to provide the contractor to actually build the facilities and/or to supervise such construction. Petitioner did not itself perform any construction work. Petitioner did not fabricate any of the material or equipment that it shipped to its customers; instead petitioner subcontracted that work to other companies. Because of the nature of its business, petitioner had no regularly recurring cycle of work. The bulk of petitioner's gross sales was bunched in a limited number of contracts of relatively long duration, as follows: FiscalAverageYearNumber of ContractsDuration1975919.33 months1976621.67 months1977714.29 monthsBecause petitioner reported*257 its income on the completed contract method of accounting, its gross sales from contracts completed and reported did not necessarily correspond to the cash it received during these taxable years. Nearly all of petitioner's contracts guaranteed that each of the plants would provide a certain quantity and quality of product, given certain measurable variables such as raw materials processed, available utilities, climate and plant location. The proposals and contracts also guaranteed the performance of the equipment acquired and sold by petitioner. Petitioner could not obtain performance bonding for its contracts because of the prohibitive costs. Petitioner's management was aware that the plants it designed generally occupied an intermediate stage in its customers' overall operations. Petitioner's management was equally aware that failure of its plants could severely disrupt its customers' businesses. Petitioner's contracts contained clauses attempting to disavow any liability for consequential damages, but petitioner's management doubted the validity and efficacy of such exculpatory clauses. During the years 1970 through 1977, petitioner incurred losses on two of its contracts. *258 Those losses were incurred as a result of design and construction deficiencies that, due to its guarantees, petitioner had to rectify at its own expense. At no time from petitioner's inception through the taxable year 1977 did petitioner so wholly fail to meet contract specifications that it was required to return all monies previously paid. However, petitioner's profits on certain contracts were reduced by various modifications to plant processes and equipment that petitioner was required to make pursuant to its guarantees. During the years in issue, approximately half of petitioner's contracts were for facilities located in the United States and the other half for facilities located in foreign countries. On its domestic contracts, petitioner usually obtained a down payment of approximately 10 percent of the contract price and then made progress billings as its work progressed. On its foreign contracts, petitioner obtained a down payment, sometimes as much as 20 percent of the contract price, and received the balance when it shipped the equipment, generally pursuant to short term letters of credit. On many of its foreign contracts, petitioner obtained insurance from the Foreign*259 Credit Insurance Association, a Federal agency that helped promote exports by providing insurance policies to cover various political and economic risks of doing business in foreign countries. That insurance did not cover petitioner's liability under its process and equipment guarantees. The manufacturing processes that petitioner incorporated into the plants it designed and sold involved the use of highly volatile chemicals. Similar plants designed by some of petitioner's competitors had experienced safety problems, including explosions causing loss of life and substantial destruction of property. Many of the plants petitioner designed and sold produced vegetable and animal oils for human consumption. Similar plants designed by some of petitioner's competitors had malfunctioned, producing adulterated oils that killed several people. None of petitioner's plants had encountered either problem up through the years before the Court. From its inception through its fiscal year 1977 petitioner had never been sued and had been threatened with only one lawsuit. Petitioner was considerably smaller than any of its competitors. Petitioner self-financed all of its business operations*260 from its own capital and retained earnings. Petitioner has never received a loan from any bank or commercial lending institution. Although petitioner self-insures most of its various business risks, such as legal fees, warranty and process guarantees, and products liability, it has not booked formal reserves for these or other contingencies. Despite the absence of such formal reserves, petitioner's management was at all times well aware of its potential liabilities. Petitioner's market was highly unpredictable, subject not only to general business cycles of "booms or busts" but particularly to fluctuations in the agricultural industry. From time to time, petitioner has been unable to obtain any new contracts for as long as six months. It cost petitioner about $25,000 (mostly salary) per month just to keep its doors open. Despite concerns over its financial health, petitioner has always managed to meet its payroll and other basic expenses. However, because of the variations in the business from period to period, petitioner's management has never been able to forecast or predict these hills or valleys in its business operations. It has been very difficult for petitioner's management*261 to determine the minimum working capital needs of the business at any given time. In comparison to its competitors, petitioner was a tiny company and its operations were on a very small scale. Because of the nature of its business, petitioner had little equipment or other fixed assets, and its net worth was reflected primarily in its liquid assets and retained earnings. To judge petitioner's ability to perform its contemplated contracts and to meet the attendant guarantees, some of petitioner's customers sought financial data from petitioner. On occasion, petitioner has lost contracts to competitors because of its small size and its limited financial resources. Petitioner sought to increase its net worth in order to obtain larger contracts and increase its business. During the 1970's, petitioner continued to grow slowly, reflecting Loew's conservative business philosophy. Milligan, Gavin, and Berger favored more rapid growth, including larger scale plants and heavier emphasis on foreign sales to offset slow periods in the domestic market. During 1975 and 1976, this long-continuing management dispute escalated and became fairly open and intense, reducing petitioner's productivity. *262 The minority group (Milligan, Gavin, and Berger) were considering leaving petitioner for other companies. Loew, the majority shareholder, considered selling his shares to outsiders but decided against it for a number of reasons. First, the minority group represented a large part of petitioner's management and engineering talent. Loew recognized that without their expertise petitioner would not be an attractive investment to an outsider; the minority stockholders had indicated that they would be unwilling to continue their employment with any new company taking over petitioner. Loew was also fearful that the minority group would leave and set up their own company in competition with petitioner. More importantly, Loew was obligated under the terms of the 1970 Stock Purchase Agreement to offer his shares only to petitioner; thus, Loew could not sell his shares to an outsider without the consent of the minority group (e.g., without a rescission of the 1970 agreement). Late in 1976, Loew chose to eliminate the management dispute by retiring, having the corporation redeem his shares pursuant to the 1970 agreement, and thus leaving management and ownership of petitioner to Milligan, *263 Gavin, and Berger. Loew had never given any thought to retiring up until about a year before he left. He was in good physical condition at the time and had no particular desire to retire. However, he did not want to see EMI, the company he had worked so long and so hard to build up, destroyed by his continuing conflict with the minority shareholders. In November of 1976, Loew resigned from his positions with petitioner. Pursuant to the 1970 Stock Purchase Agreement, petitioner purchased Loew's outstanding shares for $654,000. The transaction was designed to comply with section 302(b)(3). Although he was advised that an installment sale would be more beneficial to him from a tax viewpoint, Loew insisted upon and received a lump sum cash payment for his shares. He did so because he did not want to subject any portion of his payment to the minority group's future management of petitioner. With his conservative business philosophy, Loew could not accept the views of the minority group as to business expansion, and was unwilling to risk his interest in the business to their policies. At the same time, Low and petitioner entered into a covenant not to compete under which petitioner*264 agreed to pay Loew $180,000 in monthly installments of $3,000 for his promise not to engage in any competing business activities for five years. Although 65 years old at the time he retired from petitioner, Loew was vigorous and in good health. Since his retirement from petitioner, Loew has continued in good health and has engaged in some business activities, including some consulting work for petitioner. After Loew's departure in 1976, Milligan became petitioner's president. Milligan, Gavin, and Berger instituted many changes in petitioner's operations. In accordance with their growth plans, they began seeking more foreign business and began seeking to design and sell larger plants. The new management group also opened up stock ownership in petitioner to more of petitioner's employees. They modernized their office equipment, including adding a Telex machine and word processing.They also embarked on a program of expanded employee benefits (for both shareholder and nonshareholder employees), including expense reimbursements, medical benefits, employee loans, and salary continuation during illness or injury. Because of the depletion of petitioner's cash and other liquid assets,*265 which were used to buy back Loew's shares, the new management was seriously concerned about the survival of the business and had to work very hard the next couple of years to assure its survival and to implement growth plans for the future. The balance sheet (Schedule L) included in petitioner's fiscal 1975 return reported the following items for the beginning of the taxable year (e.g., as of September 1, 1974): ASSETSCash$ 91,946.19Trade notes and accounts receivable723,210.09Inventories182,473.28Other Current Assets: Time deposits$700,000.00Accrued interest6,423.85Prepaid insurance1,716.11$ 708,139.96Municipal bonds94,206.45Buildings and other fixeddepreciable assets21,869.98Less accumulated depreciation15,435.926,434.06Intangible assets (amortizable only)2,162.28Less accumulated amortization1,729.85432.43Other Assets: Foreign tax credits26,468.80Employee travel advances1,950.0028,418.80Total Assets$1,835,261.26LIABILITIES AND STOCKHOLDERS' EQUITYAccounts payable$ 340,796.04Other Current Liabilities: Federal income tax refund (under audit)$ 6,776.46Profit sharing trust contributions35,000.00Deposits on contracts501,899.13Accrued salaries119,900.00Accrued FICA employer204.75Federal corporation income tax41,665.11Accrued costs on closed contracts27,436.00Deferred interest on investments1,765.37State income tax4,206.67Accrued state unemployment comp.44.08Accrued Federal unemployment comp.24.49Accrued state franchise tax117.51Accrued dividends payable739,039.57Capital stock: Common stock460,000.00Paid-in or capital surplus9,856.90Retained earnings--appropriated(attached sch.)Retained earnings--Unappropriated285,568.75Total liabilities and stockholders' equity$1,835,261.26*266 Petitioner's quarterly balance sheets, prepared in-house and unaudited, reflected the following: ASSETS7411750275057508Current AssetsCash127,354.12182,350.6470,804.7084,460.50Marketable securities94,325.55327,579.45224,455.42119,600.81Commercial paper200,000.00800,000.00800,000.00Certificate of deposit300,000.00200,000.00U.S. Treasury bills250,000.00Employee loanAccounts receivable206,162.35239,555.90117,809.87608,744.27Accounts receivableunbilled2,938.944,750.00Accrued Interestreceivable3,162.152,879.334,534.872,220.94Prepaid Insurance1,017.29318.47705.74943.38Prepaid rentInventory of work inprocess424,715.49960,993.801,264,363.25466,717.66Notes receivable lessdiscount30,285.0030,285.0025,237.5025,237.50Foreign tax credits28,061.7427,748.301,279.50Federal and state taxdepositsCorporate preferredstock1,668,022.631,976,460.892,509,190.852,108,005.06Fixed assetsAutomobilesoffice equipment andfurniture22,306.0422,306.0421,941.0722,300.17Less accumulateddepreciation15,799.0716,187.9016,482.8916,857.536,506.976,118.145,458.185,442.64Other assetsTravel advance3,050.002,650.001,800.001,750.00Organization expenseless amortization324.32261.21108.103,374.322,911.211,908.101,750.001,677,903.921,985,490.242,516,557.132,115,197.70*267 7511760276057608Current AssetsCash99,239.4632,200.4322,435.2077,708.76Marketable securitles69,492.3769,495.4369,498.4969,501.55Commercial papaer1,000,000.001,000,000.00900,000.00900,000.00Certiticate of deposit300,000.00300,000.00U.S. Treasury billsEmployee loanAccounts receivable29,853.77192,474.10241,281.9983,558.69Accounts receivableunbilled29,283.33Accrued Interestreceivable3,323.075,042.914,912.081,407.72Prepaid Insurance497.871.947.821,306.72Prepaid rentInventory of work inprocess672,483.81525,791.69290,545.4842,033.05Notes receivable lessdiscount48,014.0045,231.6040,184.1037,401.70Foreign tax credits2,599.382,599.38Federal and state taxdepositsCorporate preferredstock1,922,904.351,872,835.541,902,687.871,512,918.19Fixed assetsAutomobilesoffice equipment andfurniture23,413.1124,616.4124,616.4124,709.44Less accumulateddepreciation17,240.0417,679.8518,133.9918,516.276,173.076,936.566,482.426,193.17Other assetsTravel advance1,750.001,750.002,600.002,000.00Organization expenseless amortization1,750.001,750.002,600.002,000.001,930,827.421,881,522.101,911,770.291,521,111.36*268 766770277057708Current AssetsCash199,801.54154,609.69 223,302.83 71,383.15 Marketable69,504.6169,188.70 116,475.27 115,498.05 securitlesCommercial paper200,000.00699,505.00 Certificate200,000.00 300,000.00 200,000.00 of depositU.S. Treasury147,254.86 177,483.00 billsEmployee loan30,000.00 22,000.00 Accounts175,061.27 179,923.28 125.677.10 375,962.75 receivableAccountsreceivableunbilled55,224.80208,380.09 75,564.13 334,265.73 Accrued Interestreceivable5,293.258,468.64 7,397.07 7,662.82 Prepaid Insurance662.5557.95 (604.48)2,964.06 Prepaid rentInventoryof work inprocess69,662.38177,302.06 346,366.49 127,977.83 Notesreceivable lessdiscount32,354.2030,963.00 23,133.10 21,741.90 Foreign tax creditsFederal andstate taxdepositsCorporate preferredstock48,300.00 48,300.00 807,564.601,176,148.27 1,473,094.51 2,027,261.29 Fixed assetsAutomobiles15,640.87 23,661.92 21,610.18 office equipment andfurniture24,709.4417,394.97 18,937.66 38,815.93 Less accumulateddepreciation18,895.73(8,078.37)(9,541.67)(9,389.41)5,813.7124,957.47 33,057.91 51,036.70 Other assetsTravel advance2,000.002,250.00 2,400.00 2,400.00 Organization expenseless amortization2,000.002,250.00 2,400.00 2,400.00 815,378.311,203,355.74 1,508,552.42 2,060.697.99 *269 LIABILITIESEMI CORPORATION Balance Sheet Liabilities7411750275057508Current LiabilitiesAccount payables76,110.2611,753.6515,822.6271,513.51 Contract deposits674,464.881,105,473.581,478,689.62704,660.33 Federal Income tax56,907.2611,894.4438,388.52105,310.76 State Income tax5,188.691,434.434,609.0711,229.81 Accrued engineering20,926.0013,482.0015,344.0032,390.00 Project prepayment51,500.00Deferred credits4,475.722,886.092,050.32 Accrued payroll tax41.64203.4147.865.38 Accrued compensation& profit sharingcontributions22,400.0045,000.00115,000.00240,184.85 Accrued dividend46,000.00 912,014.451,189,241.511,670,787.781,213,344.96 Stockholders equityCommon stock460,000.00460,000.00460,000.00460,000.00 Paid on capital9,856.909,856.909,856.909,856.90 Retained earnings285,568.75285,568.75285,568.75285,568.75 Net Income10,463.8240,778.0890,343.70192,427.09 Dividends paid(46,000.00)Treasury stock765,889.47796,203.73845,769.35901,852.74 1,677,903.921,985,445.242,516,557.132,115,197.10 *270 Liabilities7511760276057608Current LiabilitiesAccount payables18,122.4013,000.1132,253.6020,256.30 Contract deposits898,860.36718,145.44454,303.7689,676.42 Federal Income tax54,726.4843,438.7559,456.8354,896.41 State Income tax11,737.194,715.6513,464.1813,188.46 Accrued engineering18,530.0022,198.0027,424.0024,450.00 Project prepaymentDeferred credits1,903.473,426.054,601.352,131.80 Accrued payroll tax7.48247.3126.00236.00 Accrued compensation& profit sharingcontributions16,800.0098,000.00225,000.00206,954.62 Accrued dividend55,200.00 1,020,687.38903,171.31816,529.72466,990.01 Stockholders equityCommon stock460,000.00460,000.00460,000.00460,000.00 Paid on capital9,856.909,856.909,856.909,856.90 Retained earnings431,995.84431,995.84431,995.84431,995.84 Net Income8,287.3076,854.91193,387.83207,468.62 Dividends paid(55,200.00)Treasury stock910,140.04978,707.651,095,240.571,054,121.36 1,930,827.421,881,878.961,911,770,291,521,111.37 Liabilities7611770277057708CurrentLiabilitiesAccount payables47,146.74 124,241.23 20,923.05 514,651.96 Contract deposits250,244.51 505,457.27 880,260.96 214.153.39 Federal Income tax34,792.88 8,812.37 (1,491.90)206,606.45 State Income tax14,513.33 119.61 (536.90)18,888.74 Accrued engineering26,690.00 26,516.00 21,122.00 36,338.00 ProjectPrepaymentDeferred credits490.97 Accrued payroll tax30.36 1,486.88 321.20 362.51 Accrued compensation& profit sharingcontributions17,316.00 84,417.13 120,231.07 334,312.59 Accrued dividend27,771.15 391,224.79 751,050.49 1,040,829.48 1,353,084.79 StockholdersequityCommon stock460,000,00 460,000.00 460,000.00 460,000.00 Paid on capital9,856.90 9,856.90 9,856.90 10,169.58 Retained earnings584,264.46 584,264.46 584,264.46 584,264.46 Net Income24,032.16 44,258.31 57,295.10 337,066.34 Dividends paid(27,771.15)Treasury stock(654,000.00)(646,074.42)(643,693.52)(636,116.03)424,153.52 452,305.25 467,722.94 727,613.20 815,378.31 1,203,355.74 1,508,552.42 2,080,697.99 *271 Note: The imbalances for petitioner's fiscal quarters 7502 (February 28, 1975), 7602 (February 29, 1976), and 7608 (August 31, 1976), reflect mathematical errors in these statements, a stipulated joint exhibit, that we have been unable to reconcile. Respondent contends in this proceeding that petitioner's balance sheet accounting for its uncompleted contracts did not follow generally accepted accounting principles and that only petitioner's balance sheet for its fiscal quarter 7611 (November 30, 1976), which was prepared by an independent outside CPA firm in conjunction with the determination of the book value of Loew's shares pursuant to the stock purchase agreement, was prepared in accordance with proper accounting standards. See footnote 2 below. However, respondent has never asserted that petitioner's method of accounting failed to clearly reflect income under section 446.Respondent, in determining petitioner's net liquid assets, working capital needs under the Bardahl-Mead formula, and accumulated taxable income, utilized the information from petitioner's tax returns, including the Schedule L balance sheets. In computing petitioner's accumulated taxable income, respondent's*272 revenue agent and appeals conferee calculated petitioner's working capital needs using the formula set forth in Bardahl Manufacturing Corp. v. Commissioner,T.C. Memo. 1965-200, as modified by W.L. Mead, Inc. v. Commissioner,T.C. Memo. 1975-215, affd. 551 F. 2d 121 (6th Cir. 1977). The revenue agent's Bardahl-Mead calculations, corrected to reflect respondent's concessions on brief and certain methematical errors, are as follows: 197619771. Yearly revenues $2,441,583.   $2,539,744.   $3,206,635.   2. Average accounts  receivable  678,595.   377,419.   426,465.   3. Turnover rate (line 1 divided by line 2)3.5986.73 7.52 4. Days in accounts  receivable  cycle (365 divided by line 3)101.45 54.23 48.54 5. Accounts receivable as percentof year (line 4 divided by 365)27.79%14.86%13.30%6. Yearly expenses 2,170,189.   2,228,923.   2,653,938.   7. Expenses needed for accountsreceivable cycle603,096.   331,218.   352,974.   (line 6 X line 5)8. Average accounts payable 206,154.   45,884.   267,454.   9. Turnover rate of average accountspayable (line 610.53 48.58 9.92 divided by line 8)10. Days in accountspayable cycle(365 divided by line 9)34.66 7.51 36.79 11. Difference inaccounts receivableand accounts66.79 46.72 11.75 payable cycles (line 4minus line 10)12. Nondeferredexpenses for oneaccounts receivable cycle (line11 divided by line 4).658.86 .24213. Operatingcapital needs for onebusiness$ 396,837.   $ 285,510.   $ 85,420.   cycle (line 7 X line 12)*273 Current Assets197519761977Cash$ 84,460$ 77,708$ 71,383Accounts Receivable633,981120,960731,970Inventory466,71742,033127,978Other current assets803,1641,202,714958,432Other investments: Municipal Bonds119,68169,502115,498Loans to Stockholders22,000$2,108,003$1,512,917$2,027,261Current Liabilities197519761977Accounts Payable$ 71,513$ 20,256$ 514,652Other current liabilities1,141,831446,734838,433Total Liabilities$1,213,344$ 466,990$1,353,085Total Available WorkingCapital (Current Assets -Current Liabilities)$ 894,659$1,045,927$ 674,176Working Capital Needs forBusiness Cycle396,837285,51085,420Excess Available Working$ 497,822$ 760,417$ 588,756CapitalRespondent's computations came from the financiall data from the balance sheets (Schedules L) attached to petitioner's corporate Federal income tax returns for the years in issue, using an average of the opening and closing figures. Respondent's agent did not include an inventory cycle in computing petitioner's working capital needs under the Bardahl-Mead formula.*274 2Petitioner's*275 management, in determining working capital needs, used the figures from its tax return balance sheets, as respondent did, but applied a rough rule of thumb, a ratio of current assets to current liabilities to determine the level of working capital needed. The current net liquid asset to current liability ratios for fiscal years 1975, 1976, and 1977 were 2.13 to 1, 3.36 to 1, and 1.52 to 1. Petitioner's management normally sought to maintain a 3.0 to 1 ratio. Petitioner's balance sheets (both tax return balance sheets and in-house quarterly balance sheets) showed the following unappropriated retained earnings for the fiscal years 1975 through 1977: Fiscal YearRetainedIncrease overEnded 8-31EarningsPrior Year1974$285,568.751975431,995.84146,427.091976584,264.46152,268.621977893,559.65309,295.19The redemption of Loew's shares on November 30, 1976 did not reduce the corporation's retained earnings on its balance sheets, but petitioner's liquid assets were reduced by the $654,000 cash payment. 3*276 Both respondent and petitioner determined petitioner's available net liquid assets using figures from petitioner's tax return balance sheets (Schedules L), with slight differences from rounding off and errors in addition. 4 The available net liquid assets (current liquid assets less current liabilities) were as follows: Fiscal Year1975$894,66019761,045,9281977674,176The gross income and taxable income for each of petitioner's shareholders for the taxable years 1974 through 1977 were as follows: Marginal Rate *ShareholderYearGross IncomeTaxable IncomeTax BracketLoew1974$68,208.75$55,204.3353%/62%1975119,443.83106,612.1262%/70%1976458,726.60 ** 442,091.1670%/70%197770,449.98 *** 58,653.3553%/62%Berger197469,854.4361,248.7653%/64%197598,114.8787,994.5758%/68%1976110,119.5199,237.2860%/69%1977149,171.25 *** 141,890.8464%/70%Gavin197443,870.0035,904.0042%/50%197566,355.0057,331.0053%/62%197676,297.0066,849.7755%/64%1977132,128.00 *** 125,335.0064%/70%Milligan197449,012.0037,032.0045%/50%197574,093.0061,375.0053%/64%197683,882.0571,013.5155%/66%1977133,652.72 *** 125,255.3164%/70%*277 In 1976 petitioner loaned Milligan, a shareholder, officer and director of petitioner, $33,000 for Milligan to finance the purchase of a pleasure boat.During the years in issue, there were no other loans by petitioner to employees, officers, shareholders or directors. However, on February 11, 1977, at a special meeting, petitioner's board authorized a program of employee loans on the following terms: 1. Any loan granted would carry*278 an interest rate at least equal to available short term rates. 2. Any loan granted must be protected by a promissory note and must be paid in a period no longer than four years, with interest, and on a pre-arranged payback schedule. 3. Security requirements for loans granted would be established by the Board of Directors on a case-by-case basis and would depend upon all of the factors involved in the loan. Petitioner declared and distributed to its shareholders the following dividends: FYEDividend8-31-708-31-718-31-728-31-738-31-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,000.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,200.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,771.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,050.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,312.508-31-80157,687.50The dividends during the years before the Court represented 25%, 26%, and 8.5%, respectively, of petitioner's net income after Federal taxes for each such year. Petitioner's returns for its fiscal years in issue reported its income and expenses follows: Item197519761977Gross receipts/sales$2,441,583.24 $2,539,744.82 $3,206,635.28 Cost of goods sold(1,564,505.32)(1,557,852.17)(1,716,582.89)Gross profit877,077.92 981,892.65 1,490,052.39 Other income (interest, etc.)60,072.37 70,474.74 49,773.46 Total income937,150.29 1,052,367.39 1,539,825.85 Operating expenses(605,683.68)(671,071.26)(937,356.15)Noncash deductions(depreciation, amortization,etc.)(1,854.04)(1,658.74)(6,812.33)Taxable Income329,612.57 379,637.39 595,657.37 Federal income taxes(145,707.83)(170,552.31)(269,043.57)Net income after Federalincome taxes$ 183,904.74 $ 209,085.08 $ 326,613.80 *279 Respondent, in his statutory notice, accepted these figures. In his statutory notice, respondent computed petitioner's accumulated earnings tax liability as follows: Computation of Accumulated750876087708Taxable IncomeTaxable Income (Line 4, Schedule 1)$329,612.57$379,637.39$595,657.37Add: Special deductions1,356.18disallowed, section 535(b)(3)Total329,612.57379,637.39597,013.55Less: Federal income145,707.83165,885.64269,043.57tax paid per returnForeign income tax paid per return1,279.502,599.38Taxable income as adjusted182,625.24211,152.37327,969.98Less: Dividends paid46,000.0055,200.0027,771.15deduction (section 535(a))Current earnings and profits retained136,625.24155,952.37300,198.83Less: Accumulated earnings creditAccumulated taxable income$136,625.24$155,952.37$300,198.83Computation of AccumulatedEarnings TaxAccumulated taxable income$136,625.24$155,952.37$300,198.8327 1/2% on first $100,000.0027,500.0027,500.0027,500.0038 1/2% excess over $100,000.0014,100.7221,541.6677,076.55Total accumulated earnings tax$ 41,600.72$ 49,041.66$104,576.55Computation of AccumulatedEarnings CreditMinimum accumulated$150,000.00$150,000.00$150,000.00earnings creditLess: Accumulated285,568.75431,995.84584,264.46earnings as of close of prior yearAllowable minimum creditunder section 535(c)(2)Current earnings andprofitsdetermined to be retainedfor reasonable needs ofbusiness, (section 535(c)(1)(A)Less: Deduction for long-termcapital gains,(section 535(b)(6)Allowable credit undersection 535(c)(1)*280 ULTIMATE FINDING OF FACT Petitioner was not availed of for the purpose of avoiding the income tax with respect to its shareholders. OPINION An accumulated earnings tax is imposed upon "every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed." Secs. 532(a), 531. The ultimate question, upon which the corporate taxpayer has the burden of proof, is whether a purpose of its accumulation was avoiding the income tax with respect to its shareholders (the "proscribed purpose"). United States v. Donruss Co.,393 U.S. 297 (1969). This is a question of fact. Atlantic Properties, Inc. v. Commissioner,519 F. 2d 1233, 1235 (1st Cir. 1975), affg. 62 T.C. 644, 656 (1974); American Metal Products Corp. v. Commissioner,287 F. 2d 860, 863-864 (8th Cir. 1961), affg. 34 T.C. 89 (1960); Kerr-Cochran, Inc. v. Commissioner,253 F. 2d 121, 124 (8th Cir. 1958), affg. a Memorandum Opinion of this Court. *281 The major factor in determining the applicability of the accumulated earnings tax is the taxpayer's reasonable business needs for accumulating its earnings and profits. See United States v. Donruss Co.,supra,393 U.S. at 307; Faber Cement Block Co. v. Commissioner,50 T.C. 317, 327 (1968). A determination of reasonable business needs is critical in two respects: (1) to compute the section 535(c) credit in calculating the accumulated taxable income, and (2) the decide whether the presumption of a tax-avoidance purpose under section 533 applies. If the taxpayer can show that all of its current earnings were accumulated for the reasonable needs of its business, there is no accumulated earnings tax since the accumulated earnings credit, section 535(c), eliminates the amount against which the tax is imposed. Chaney & Hope, Inc. v. Commissioner,80 T.C. 263, 281 (1983); Magic Mart, Inc. v. Commissioner,51 T.C. 775, 799 (1969); John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 474 (1965). Even if the retention of all of its current earnings is not justified, the amount of the taxpayer's reasonable*282 business needs is nonetheless necessary to properly determine the section 535(c) credit. Whether a taxpayer's accumulation of earnings and profits is in excess of its reasonable business needs is also a question of fact. Helvering v. National Grocery Co.,304 U.S. 282 (1938). In determining the reasonable business needs of a corporation, we are reluctant to substitute out judgment for the business judgment of corporate management who are most familiar with the complexities and make-up of their corporation and its business, and we will not substitute our judgment unless the facts and circumstances compel our doing so. Atlantic Properties, Inc. v. Commissioner,supra; Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 329, and cases cited therein. A taxpayer's reasonable business needs include its reasonably anticipated business needs. Sec. 537(a)(1). Section 1.537-1(b)(1), Income Tax Regs., provides: In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation*283 must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. In a closely held corporation, the type of corporation normally involved in an accumulated earnings case, it is not necessary that the "specific, definite, and feasible" plans alleged in support of an accumulation be inscribed in formal minutes. Doug-Long, Inc. v. Commissioner,72 T.C. 158, 171 (1979); John P. Scripps Newspapers v. Commissioner,supra,44 T.C. at 469. And the taxpayer need not produce meticulously drawn formal blueprints*284 for action. Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 332; John P. Scripps Newspapers v. Commissioner,supra,44 T.C. at 469. It is not sufficient, however, for the corporation merely to recognize a future need and discuss possible and alternative solutions concerning the same. Atlantic Commerce and Shipping Co. v. Commissioner,500 F. 2d 937, 940 (2d Cir. 1974), affg. a Memorandum Opinion of this Court; Estate of Lucas v. Commissioner,71 T.C. 838, 853 (1979), affd. 657 F. 2d 841 (6th Cir. 1981). Definiteness of plan coupled with action taken toward the consummation thereof are essential. Dixie, Inc. v. Commissioner,277 F. 2d 526, 528 (2d Cir. 1960), affg. 31 T.C. 415 (1958), cert. den. 364 U.S. 827 (1960); Doug-Long, Inc. v. Commissioner,supra,72 T.C. at 171; Estate of Lucas v. Commissioner,supra,71 T.C. at 853. In other words, "the intention claimed must be manifested by some contemporaneous course of conduct directed toward the claimed purpose." Smoot Sand & Gravel Corp. v. Commissioner,241 F. 2d 197, 202 (4th Cir. 1957),*285 affg. in part a Memorandum Opinion of this Court, cert. denied 354 U.S. 922 (1957). The test is a practical one, namely, whether the alleged plan appears to have been "a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations." Faber Cement Block Co. v. Commissioner,supra,50 T.C. at 332-333. In determining whether the earnings and profits of any taxable year have been accumulated beyond the reasonable needs of the business, it is necessary to consider whether accumulated earnings and profits of prior years were sufficient to meet the taxpayer's reasonable business needs (including reasonably anticipated needs) for the current year. Atlantic Properties,Inc. v. Commissioner,supra, 62 T.C. at 656. We do not, however, merely compare the total amount needed in the business with the taxpayer's total accumulated earnings and profits. Rather, we look to the accumulated earnings and profits that are reflected in net liquid assets. Ivan Allen Co. v. United States,422 U.S. 617, 628 (1975); Smoot Sand & Gravel Corp. v. Commissioner,274 F. 2d 495, 501 (4th Cir. 1960),*286 cert. denied 362 U.S. 976 (1960), affg. a Memorandum Opinion of this Court; Montgomery Co. v. Commissioner,54 T.C. 986, 1008 (1970). As the Supreme Court said in Ivan Allen Co. v. United States,supra,422 U.S. at 628, "The question, therefore, is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business." When accumulated surplus is retained in the form of liquid assets, it is available to meet business needs, and if sufficient to meet the current and reasonably anticipated future business needs of the corporation, there is a strong indication that any additional accumulation of profits of the current year is beyond the reasonable needs of the business. Atlantic Properties, Inc. v. Commissioner,supra, 62 T.C. at 656; Novelart Manufacturing Co. v. Commissioner,52 T.C. 794 (1969), affd. 434 F. 2d 1011 (6th Cir. 1970), cert. denied, 403 U.S. 918 (1971); John P. Scripps Newspapers v. Commissioner,supra,44 T.C. at 467-468; sec. 1.535-3(b)(1)(ii), Income Tax Regs.The*287 fact that a corporation has accumulated its earnings and profits beyond its reasonable business needs raises a presumption that the accumulation was for the proscribed purpose, "unless the corporation by the preponderance of the evidence shall prove to the contrary." Sec. 533(a). For the accumulated earnings tax to apply, it is enough if the proscribed purpose is one of the purposes behind the accumulation, even if it is not the "dominant, controlling, or impelling" one. United States v. Donruss Co.,supra,393 U.S. at 301. Indeed, the taxpayer must show a complete lack of the proscribed purpose. Pelton Steel Casting Co. v. Commissioner,28 T.C. 153, 174 (1957), affd. 251 F. 2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958 (1958). With the foregoing principles in mind, we turn to the facts of this case. Petitioner has the burden of proving the reasonable business needs for its accumulations and the overall burden of proving the absence of the proscribed purpose. 5 While the decisional law furnishes us many guidelines and virtually innumerable cases can be cited for the various legal propositions, the inquiry nonetheless*288 remains quintessentially a factual one. Reasonable business needs cannot be determined in a vacuum or out of the context of the given business or industry. In evaluating petitioner's reasonable business needs, we must keep in mind the nature of petitioner's particular business and the business environment in which it operated. Petitioner's business is to design and engineer complete processing plants for its customers. Petitioner's work involves engineering services, design and purchase of equipment and material for such plants, on-site engineering and inspection services during construction, and inspection and testing of the completed plants. Each such plant is essentially custom-designed. Each of petitioner's contracts has varying specifications and work to be performed. The bulk of petitioner's*289 gross sales is bunched in just a few contracts of relatively long duration. Because of the nature of its work, petitioner has no regularly recurring cycle of work and petitioner reports its income for tax purposes on the completed contract method of accounting. Petitioner is a small company, much smaller than any of its competitors. Because of the nature of its business petitioner has few fixed assets and its net worth is reflected in its liquid assets and retained earnings. Because petitioner is so small, customers often seek financial data about petitioner's net worth and petitioner occasionally loses prospective contracts because of its small size. Petitioner tries to increase its net worth in order to obtain larger contracts and increase its business. Petitioner self-finances all of its operations and has never borrowed any money. Petitioner also self-insures its various business risks. Since about half of its work is in foreign countries, petitioner encounters additional risks, political and economic, flowing from that fact. Petitioner's contracts guarantee that the plants it designs will provide a certain quantity and quality of product. Petitioner also guarantees the*290 performance of the equipment it sells to its customers. Petitioner cannot obtain performance bonding to cover its work and these process and equipment performance guaranties because of prohibitive cost. The plants designed by petitioner occupy an intermediate stage in the customer's overall operations, and any failure of such plant will have a ripple effect throughout the customer's business. Petitioner tries to include exculpatory clauses in its contracts to protect itself at least from claims for consequential damages from malfunctioning or failure of plants it designs. However, petitioner's management doubts the efficacy of such exculpatory clauses and is well aware of the company's potential liabilities. Occasionally there are design and construction deficiencies that petitioner has to rectify at its own expense, and therefore petitioner occasionally suffers a loss on a contract. Also many of these plants use volatile raw materials with potential for explosions, and many of the plants process materials for human consumption, with attendant risks of product liability claims. Petitioner has not had any explosions or other product liability claims, but its competitors have. *291 Petitioner does not set up formal reserves on its books for these various items, but its management is will aware of and has in mind these various needs for its liquid assets and retained earnings. Respondent accords little consideration to the peculiar nature of petitioner's business, the competitive environment in which it operates, or the various factors that petitioner's management think warrant the retention of liquid assets and its accumulated earnings. Respondent seemingly looks only to what he regards as petitioner's high liquidity 6 and to his computation of working capital needs, which is the only business need respondent acknowledges and which respondent computes under the Bardahl-Mead formula. BardahlManufacturing Corp. v. Commissioner,T.C. Memo. 1965-200, as modified by W.L. Mead, Inc. v. Commissioner,T.C. Memo. 1975-215, affd. 551 F. 2d 121 (6th Cir. 1976). Respondent's computation includes no inventory cycle although petitioner has a substantial inventory of equipment and materials it purchases for installation in the plants it designs for its customers. First, we will discuss petitioner's working capital*292 needs and then its other reasonable business needs. *293 A. Reasonable Business Needs1. Working Capital NeedsWorking capital is of course a reasonable business need. Sec. 1.537-2(b)(4), Income Tax Regs.; Doug-Long, Inc. v. Commissioner,supra,72 T.C. at 176; Magic Mart, Inc. v. Commissioner,supra,51 T.C. at 791-793. To inject a degree of objectivity into this determination, we have generally endeavored to calculate a taxpayer's working capital needs for a single, complete operating cycle. This cycle attempts to trace a taxpayer's application of cash, representing working capital, through the taxpayer's operations until it emerges again as cash. Generally, an operating cycle is the period of time needed to convert cash into raw materials, raw materials into finished goods, inventory into sales and accounts receivable, and any accounts receivable into cash. See Bardahl Manufacturing Corp. v. Commissioner,supra;Alma Piston Co. v. Commissioner,T.C. Memo. 1976-107, affd. 579 F. 2d 1000 (6th Cir. 1978). We and other courts have employed the Bardahl operating cycle test flexibly to reflect more accurately the business realities*294 of the particular taxpayer involved. See Cataphote Corp. of Mississippi v. United States,210 Ct. Cl. 125, 535 F. 2d 1225, 1234-1235 (1976); Magic Mart, Inc. v. Commissioner,supra,51 T.C. at 791-794; Suwannee Lumber Manufacturing Co. v. Commissioner,T.C. Memo. 1979-477 and cases cited at n. 16; Delaware Trucking Co., Inc. v. Commissioner,T.C. Memo. 1973-29. Indeed, we and other courts have approved application of the Bardahl operating cycle approach to various non-manufacturing businesses, including service businesses, although generally with certain modifications to reflect the particular taxpayer's circumstances. See Central Motor Co. v. United States,583 F. 2d 470, 482-483 (10th Cir. 1978) (finance companies); C.E. Hooper, Inc. v. United States,210 Ct. Cl. 615, 539 F. 2d 1276 (1976) (market analysis corporation); W.L. Mead, Inc. v. Commissioner,supra (motor freight company). However, the operating cycle approach is not a rule of law--" [T]heBardahl formula is an attempt to inject a degree of objectivity into a quantification of business*295 needs; it is a tool to be used when helpful and its use is not mandated in all events." Thompson Engineering Co. v. Commissioner,80 T.C. 672, 697 (1983), revd. on another point 751 F. 2d 191 (6th Cir. 1985). See also Dielectric Materials Co. v. Commissioner,57 T.C. 587, 599 (1972). Respondent argues that the Bardahl-Mead formula has been "sanctioned" by this Court and should be applied in this case. We disagree. Because of the computational steps in the Bardahl-Mead formula, its application here would create an illusion of exactitude and would leave a strong impression of mathematical certainty. We think, however, any such impression of mathematical precision is wholly illusory in this particular case. This is graphically demonstrated by comparing respondent's computations set out in our Findings of Fact with our own vastly different computations set out in Appendix I to this opinion. Quite apart from respondent's failure to include an inventory cycle, which we have rectified in our computation (Appendix I), the fundamental flaw here is that there simply is no recurring business cycle. To try to erect such a cycle through*296 the computational steps of the Bardahl formula, with or without the Mead modification, is misleading. We agree with petitioner's officers that the peaks and valleys in its business cannot be predicted with any reasonable degree of accuracy and that its "lean years" and its "fat years" simply do not lend themselves to the formulistic quantification of Bardahl-Mead. The Court believed the testimony of petitioner's officers that they themselves could never predict their working capital needs with any degree of accuracy. That being so, the Court is peculiarly loathe to substitute its judgment for the business judgment of petitioner's management on this matter. That is particularly so where the Court has little faith in its own Bardahl computation (Appendix I) save a belief that it is more accurate than respondent's computation. For example, respondent's Bardahl-Mead computation determines working capital needs of only $85,420 for 1977. We think that is a totally unrealistic figure. The record shows that there were periods of up to six months during which petitioner could obtain no new contracts and that it cost petitioner about $25,000 a month (mainly salary) *297 just to keep its doors open. The Court thinks that a bare minimum working capital figure for petitioner would be $150,000 (6 months X $25,000) per year. The Court also finds respondent's $85,420 figure for 1977 wholly unacceptable because that was a year when there was an increase in gross revenue and a sharp decrease in liquid assets as a result of the redemption of Loew's shares for a lump sum cash payment of $654,000. The record shows that the new controlling management group was cash-starved after the redemption, had doubts as to whether the corporation would survive, and had to work extremely hard to rebuild the liquid assets needed to operate the business. Even the Court's Bardahl computation shows some decline in working capital needs that year (which we think is clearly not the case), but certainly a less precipitous decline than that proposed by respondent. Under the circumstances of this case, with petitioner's longterm contracts, with its income bunched in just a few contracts of relatively long duration, with its use of the completed contract method of accounting, and most importantly with the absence of any regularly recurring operating cycle, we decline to apply*298 the Bardahl formula. We think that any attempt to apply the Bardahl formula "flexibly" or otherwise in this case would be no more accurate than applying a rough rule of thumb to determine working capital needs. We also think an attempt to use the Bardahl formula might well give an air of precision to something that would be simply a usurpation of petitioner's exercise of its own best business judgment. We are not suggesting, however, that we must always defer to the business person's "judgment calls" in such cases. Petitioner's management used a rough rule of thumb (current liquid assets to current liability ratio of 3.0 to 1) to forecast working capital needs. That may be too rough a guideline and may perhaps too often result in a negative figure (working capital needs in excess of current net liquid assets). Still some kind of rule of thumb may well be a reasonable way for petitioner's management to try to even out the hills and valleys in their efforts to estimate reasonable working capital needs from year to year. Because of our conclusion that petitioner also had other reasonable business needs each year, the need for working capital is not the sole determining*299 factor, as respondent assumes it to be. Suffice it to say, the Court does not wholly accept petitioner's rule of thumb. On the other hand, the Court is satisfied that petitioner's working capital needs for each year somewhat exceeded those recomputed by the Court under the Bardahl formula (Appendix I), probably by an amount of $150,000 (the bare minimum working capital figure). We would add this $150,000 figure each year because fiscal 1975 and 1976 were slow years as far as obtaining new business, which was another source of tension between Loew and the minority group, and because in fiscal 1977 after Loew's departure there was a cash crunch just when the new controlling group was trying to expand petitioner's operations, particularly in the foreign market. Therefore, we conclude petitioner's management would not be acting unreasonably in assuming that the working capital needs projected for the next year would be liquid assets of approximately 1.0 to 1.5 times its liabilities at the end of each year, and thus a reasonable amount to retain at the end of each year. This historical approach would have some degree of accuracy as to the actual liabilities it had encountered, *300 with some factor for contingencies or expanded needs that might occur in the future. We will next discuss the factor of contingent liabilities. 2. Contingent LiabilitiesA taxpayer may reasonably accumulate earnings as a reserve against some contingent liabilities. "[A] contingency is a reasonable need for which a business may provide if the likelihood of its occurrence reasonably appears to a prudent businessman." Dahlem Foundation, Inc. v. United States,405 F. 2d 993, 1003 (6th Cir. 1969); C.E. Hooper, Inc. v. United States,supra, 569 F. 2d at 1289; Smoot Sand & Gravel Co. v. Commissioner,supra,241 F. 2d at 206. On the other hand, an accumulation is not justifiable if the contingent liability is merely a remote possibility. Chaney & Hope, Inc. v. Commissioner,supra,80 T.C. at 285-286; J. Gordon Turnbull, Inc. v. Commissioner,41 T.C. 358, 374-375 (1963), affd. 373 F. 2d 87 (5th Cir. 1967). Whether a corporation's accumulation of earnings for a contingent liability is reasonable depends upon all the facts and circumstances. William C. Atwater & Co. v. Commissioner,10 T.C. 218, 230 (1948);*301 Estate of Kriesel v. Commissioner,T.C. Memo. 1978-50. Petitioner argues that it was entitled to accumulate earnings to satisfy its process and equitpment performance guarantees, including possible consequential damages from the interruption of its customers' manufacturing processes, and as a reserve against potential legal liability arising from plant accidents or adulterated food products at the plants it designed and sold. Respondent argues that the liability for additional costs petitioner incurred in satisfying its warranty obligations were already accounted for in the same manner as a formal reserve by the deferred profit element in petitioner's customer deposits liability account. Respondet also argues that any potential legal liability of petitioner from these risks is entirely too remote and speculative to justify an accumulation of earnings. We do not fully agree with either party. The record clearly indicates that petitioner incurred substantial costs in satisfying its equipment and process guarantees, reducing its overall profit on these contracts. The record, however, also indicates that petitioner deducted these expenses as incurred. To the extent*302 that such costs were accrued but not paid at year's end, they were already reflected in liability accounts on petitioner's books. This liability has already reduced petitioner's net liquid asset figures. Moreover, these deductions have already been taken into account in petitioner's taxable income for each year in issue, the starting point for calculating the accumulated earnings tax. See sec. 535(a). Accordingly, we do not allow any additional amount as a reasonable business need justifying retention of accumulated earnings. We reject respondent's argument that the clauses in petitioner's contracts with its clients by whith it attempted to exculpate itself from consequential damages preclude any accumulation of earnings for such a potential liability. Such exculpatory clauses are of uncertain enforceability, see UCC § 2-719 (1976); Restatement (Second) Contracts §§ 356, 208 and 356 commented (1981), a fact that petitioner's management recognized. We also reject respondent's argument that as a matter of law, "there must be some actual or threatened legal action justifying the reserve or, at least, an historical basis*303 from which future liability appears likely or uncertain." An accumulation as a reserve against a potential liability is not precluded simply because the taxpayer itself has no history of such liability. See Wilcox Manufacturing Co., Inc. v. Commissioner,T.C. Memo. 1979-92. We must examine all the facts to ascertain whether a prudent business person in petitioner's position would reasonably anticipate and hedge against such a potential liability. We are persuaded that these potential legal liabilities were reasonably anticipated business needs of petitioner's that justified some accumulations of earnings. Although petitioner had no history of damage claims for plant accidents, adulterated food-stuffs, or consequential damages from plant breakdowns, we think that a prudent business person would nonetheless endeavor to guard against such risks. Petitioner's competitors had suffered plant accidents and food adulteration of large magnitude, involving loss of life and large scale destruction of property. Similarly, the ripple effects from the interruption of the middle stage of a large, integrated manufacturing process are obvious. A business person cannot prudently*304 ignore such risks simply because the business had been sufficiently competent (or lucky) in the past to avoid any such liability. Moreover, even assuming successful legal defense against such claims, the possibility of litigation expense is neither remote nor speculative. Given the nature of petitioner's business, we do not consider such possibilities too remote. Exercising our best judgment on the facts in this case, including some cushion provided by the unrealized profit on petitioner's uncompleted contracts reflected in its customer deposits and considering the expansion of the scope and scale of petitioner's business after the buy-out of Loew, we hold that petitioner was entitled to accumulate $50,000 in fiscal 1975 and 1976, and $100,000 in fiscal 1977, as reserves against these potential liabilities. 3. Business ExpansionA corporation may reasonably accumulate earnings to fund an expansion of its business. Sec. 1.537-2(b)(1), Income Tax Regs.; Chaney & Hope, Inc. v. Commissioner,supra,80 T.C. at 290-291; Bremerton Sun Publishing Co. v. Commissioner,supra, 44 T.C. 583; Crawford County Printing & Publishing Co. v. Commissioner,17 T.C. 1404, 1414 (1952).*305 Of course, a taxpayer's plans to expand must be "specific, definite, and feasible" to justify the accumulation of earnings for such plans. Sec. 1.537-1(b)(1), Income Tax Regs.Because petitioner was unable to obtain performance bonds, some potential clients looked to petitioner's financial status (net worth) to satisfy themselves that petitioner would be able to perform its contractual obligations. Because of its small size in relation to its competitors, petitioner lost some potential clients. Petitioner argues that it accumulated its earnings to increase its net worth to make itself more attractive to potential clients and to enable it to bid on larger contracts. We agree, but the stockholders disagreed among themselves over how to use effectively any such increased net worth. Loew, as majority stockholder in fiscal 1975 and 1976, wanted more or less passively to increase net worth and have the clients seek petitioner out. Loew wanted to rely upon the considerable expertise and reputation of the four individual stockholders, assuming that would continue to bring in prospective clients and that increased net worth would assure petitioner of getting more of the contracts from*306 those clients. The minority stockholders wanted to pursue new business, particularly in the foreign market, more vigorously--i.e. spend money to make money. During petitioner's fiscal years 1975 and 1976, it is clear that petitioner had no plans to expand. Loew and his conservative business philosophy were still in the ascendant. It was Loew's slow-growth policy that caused the feud with the minority group, eventually leading to Loew's retirement and petitioner's redemption of Loew's shares. While Loew was in control of petitioner, there were no expansion plans as such. From our observance of Loew and his testimony at trial, we are satisfied that he genuinely believed his "plan" (slow steady growth through plowing the earnings back into the business) was in the best interest of the company. He simply could not accept the views of the minority stockholders as shown by the fact that he insisted on a lump-sum payment for his shares even though he knew that installment payments would result in a considerable tax saving to him. Loew simply would not risk his interest in the business to the control of the minority stockholders and their plans for more rapid expansion of the business. *307 During petitioner's fiscal year 1977 after Loew's departure, the new management group sought to expand petitioner's business. However, because the liquid assets of the company were reduced by the $654,000 cash payment to Loew and the payments on the covenant not to compete, the new managers were short of cash and did not draw up or implement any specific plan of action that first year. The record does show that they made a number of changes in petitioner's operations and did pursue contracts for larger scale plants and more foreign business. While respondent urges that there was no "specific, definite and feasible" plan of expansion (sec. 1.537-1(b)(1), Income Tax Regs.), we think respondent overemphasizes formalities in this instance. We think the new controlling group at least made a beginning. While we are not able or willing to place a dollar figure on expansion plans as a reasonable business need, we think it is clear from the record as a whole that that was nonetheless a real consideration in the minds of petitioner's management at least in 1977 and in the minds of the monority shareholders in all three years. As it turned out, the minority shareholders could do little*308 until Loew's shares were redeemed by the corporation. 4. Redemption NeedsA corporation may reasonably accumulate its earnings to fund a redemption of the shares of dissident or departing minority stockholders. C.E. Hooper, Inc. v. United States,supra,539 F. 2d at 1289-1290; Mountain State Steel Foundries, Inc. v. Commissioner,284 F. 2d 737, 744-745 (4th Cir. 1960), revg. T.C. Memo. 1959-59; Dill Manufacturing Co. v. Commissioner,39 B.T.A. 1023 (1939). 7 Whether the redemption of a majority stockholder's shares is a reasonable business need for the accumulation of the corporation's earnings and profits is a more difficult question. Compare Pelton Steel Casting Co. v. Commissioner,251 F. 2d 278 (7th Cir. 1958), affg. 28 T.C. 153 (1957), cert. denied 356 U.S. 958 (1958) and Lamark Shipping Agency, Inc. v. Commissioner,T.C. Memo. 1981-284 with Vulcan Steam Forging Co. v. Commissioner,T.C. Memo. 1976-29. See generally, D. Herwitz, Stock Redemptions and the Accumulated Earnings Tax, 74 Harv. L. Rev. 866, 908-931 (1961).*309 Relying on Pelton Steel Casting Co. v. Commissioner,supra, respondent paints a picture of Loew, as majority stockholder, causing the corporation to accumulate its earnings beyond its reasonable business needs for his personal reasons, namely, in order to redeem his shares so he can bail out his earnings and profits from the business at capital gains rates. Respondent emphasizes the fact that the corporate minutes state Loew was retiring because of age--age 65 which respondent describes as "a standard time in life to retire." We think the facts of the present case are wholly different from those in Pelton SteelCasting.Here there was a stock purchase agreement whereby all shareholders were required to sell their shares only to the corporation and at a stated percentage of book value. This 1970 Stock Purchase Agreement long antedated the redemption of Loew's shares. There is no suggestion that this Stock Purchase Agreement was designed to serve the personal interests of the*310 stockholders rather than the business interest of the corporation. Moreover, despite respondent's arguments to the contrary, Loew at age 65 was vigorous, in good health, and had no desire to retire. He had never thought about retirement until the last year before the redemption. He retired because the tension and disputes with the minority shareholders, caused by the clash of his conservative business philosophy with their more aggressive plans for the company's future, could not be resolved. He retired because he did not want to see the company he had worked so long and so hard to build up destroyed. Under the facts of this case, we think redemption of the majority stockholder's shares served a corporate purpose and could be a reasonable business need of the company. However, petitioner has never argued that it was accumulating its earnings in order to redeem Loew's share, and we need not resolve the question of redemption of a majority stockholder's shares as a reasonable business need. What petitioner argues is that its obligation under the 1970 Stock Purchase Agreement to purchase the shares of any stockholder leaving petitioner's employ justifies accumulations of $57,114, *311 $86,399, and $116,853 during its respective fiscal years 1975, 1976 and 1977. Those figures apparently represent 20 percent of petitioner's total accumulated earnings for each preceding fiscal year. While we do not necessarily accept the basis for these figures, we agree with the general idea. Without regard to Loew, any of the minority shareholders, each of whom had a 13.33 percent ownership interest, could have required petitioner to purchase his shares at 90 percent of book value at any time. Since the minority shareholders were threatening to leave the company, petitioner had a reasonable business need to be able to purchase the shares of at least one minority stockholder or possibly all three minority stockholders. Since the redemption price for one minority stockholder could be as much as $145,333.33 and that for all three as much as $436,000, 8 petitioner's figures seem eminently reasonable, and no doubt much too low. If we used the 20 percent of accumulated earnings approach, we would apply that rate to the current year's accumulation, for figures of $86,399, $116,853, and $178,712, for fiscal years 1975, 1976, and 1977, respectively. That is because we are determining*312 the portion of the total earnings petitioner could reasonably retain at the end of each year. 5. Summary of Reasonable Business NeedsWe must summarize our conclusions as to petitioner's reasonable business needs to determine whether petitioner accumulated and retained its earnings beyond its reasonable business needs so as to give rise to the presumption of the existence of the proscribed tax-avoidance purpose. Sec. 533(a). Since we have not availed ourselves of a Bardahl-Mead computation and have determined working capital needs within a range of figures and since we have found other reasonable business needs, some quantified and some not and some of which may be subsumed in the category of working capital needs and some not, our holdings cannot be readily or neatly tabulated. In our opinion, the bare minimum working capital needs for each year would be no less than the Court's Bardahl computation figures (Appendix I) which we think should be increased by $150,000 for each*313 year as discussed above; the maximum would be 1.5 times petitioner's liabilities each year. Thus, the range for petitioner's working capital needs would be as follows: Court's BardahlPetitioner's Quick AssetFiscalCourt's BardahlComputationto Liability Ratio(Appendix I)YearComputationPlus $150,0001.01.5(Appendix I)1975$627,566$777,566$1,213,344$1,820,1661976573,472723,472* 466,990700,4851977540,339690,3391,353,0852,029,628For contingent liabilities, we have found an amount of $50,000 for 1975 and 1976 and $100,000 for 1977. We have allowed no specific dollar amount for expansion plans although we think it was*314 a genuine consideration in each year, even by Loew in his own conservative view of how the company should continue to develop. For redemption needs which we think were critical for the company's survival given the impasse between Loew and the minority stockholders, we think a range from $145,000 to $436,000 was a bare minimum for 1975 and 1976. Because of possible overlapping, we would use the high figure with the low working capital figure and the low figure with the high working capital figures. Since the net liquid assets for the years at issue were only $894,660, $1,045,928, and $674,176, respectively, it is clear that under any combination of our figures, petitioner's reasonable business needs exceeded its net liquid assets each year. B. The Proscribed PurposeWe have compared petitioner's reasonable business needs to its net liquid assets above, and concluded that the net liquid assets did not exceed petitioner's reasonable business needs. We think, however, a comparison of petitioner's total accumulated earnings to its net liquid assets is also instructive in this case. Total AccumulatedFiscal YearNet Liquid AssetsEarnings1975$894,660$431,995.8419761,045,928584,264.461977674,176893,559.65*315 The proscription of the statute is against an unreasonable accumulation of earnings (for the proscribed purpose), not against the company's having its assets in liquid form. The total accumulated earnings were 48.3%, 55.9%, and 133% of net liquid assets in each respective year. In 1977 the total accumulated earnings exceeded petitioner's net liquid assets by $219,383.65; in other words, after the redemption of Loew's shares, the company was short of cash and other liquid assets. In the two previous years when the net liquid assets were much higher, they greatly exceeded petitioner's total accumulation of earnings. This satisfies the Court that the nature of petitioner's business and its method of operation called for large amounts of liquid assets, and that petitioner's high liquidity was not necessarily related to some plan to try to avoid tax on the shareholders or to bail out the majority shareholder's earnings and profits in the corporation at capital gains rates. Since we have found that petitioner did not retain or accumulate its earnings beyond its reasonable business needs in the years before the Court, the presumption of a tax-avoidance purpose under section 533(a) does*316 not come into play. Moreover, with or without any such presumption, we would not find the proscribed purpose in this case. The record is simply devoid of any evidence that in the 1975 and 1976 fiscal years Loew's tax situation (let alone that of the minority shareholders) played any part in the corporation's decision to retain or accumulate earnings. The Court believed Loew's testimony that the accumulations were for entirely different reasons, namely, his conservative business philosophy of growth through increasing the company's net worth. In fiscal 1975 and 1976, petitioner paid dividends amounting to 25 and 26 percent of its net income after Federal taxes. Contrary to respondent's scenario, Loew did not cause the corporation to accumulate its earnings so that he could bail out his share of the earnings at capital gains rates. Certainly in 1977 the new controlling group never gave any thought to availing of the corporation to reduce their own income taxes; the new owners were busy trying to rebuild the depleted liquid assets and to expand the business. Even in fiscal 1977 when the new management group was struggling to expand the corporation's operations, petitioner paid dividends*317 of 8.5 percent of its net income after taxes. In any event, having found that petitioner did not retain or accumulate its earnings beyond its reasonable business needs, we really need not consider whether petitioner was availed of for the proscribed purpose in the years before the Court. John P. Scripps Newspapers v. Commissioner,supra,44 T.C. at 474. That is so because the accumulated earnings credit provided for in section 535(c) would be equal to the full amount of petitioner's current earnings and profits retained in those years (amounts or $146,427.09, $152,268.62, and $309,295.19 for the fiscal years 1975, 1976, and 1977, respectively). This would result in accumulated taxable income equal to zero. We, therefore, hold that petitioner is not liable for accumulated earnings tax in any of its fiscal years 1975, 1976, or 1977. See Chaney and Hope, Inc. v. Commissioner,supra,80 T.C. at 281 and cases cited therein. To reflect the above holdings, Decision will be entered for petitioner.APPENDIX I To determine petitioner's working capital needs under the Bardahl-Mead formula, we would first adjust petitioner's unaudited*318 balance sheets to more closely reflect proper accounting principles (which will be discused below) as follows: ASSETS7411750275057508Current AssetsCash127,354.12182,350.6470,804.7084,460.50Marketable securities94,325.55327,579.45224,455.42119,680.81Commercial paper200,000.00800,000.00800,000.00Certificate of deposit300,000.00200,000.00U.S. Treasury bills250,000.00Employee LoanAccounts receivable206,162.35239,555.90117,809.87600,744.27Accounts receivableunbilled2,938.944,750.00Accrued interestreceivable3,162.152,879.334,534.872,220.94Prepaid insurance1,017.29318.47705.74943.38Prepaid rentInventory of work inprocess21,235.7848,049.6963,218.1623,335.88Notes receivable lessdiscount30,285.0030,285.0025,237.5025,237.50Foreign tax credits28,061.7427,748.301,279.50Federal and state taxdepositsCorporate preferredstock1,264,542.921,063,516.781,308,045.761,664,623.28Fixed assetsAutomobilesoffice equipment andfurniture22,306.0422,306.0421,941.0722,300.17furnitureLess accumulateddepreciation15,799.0716,187.9016,482.8916,857.536,506.976,118.145,458.185,442.64Other assetsTravel advance3,050.002,650.001,800.001,750.00Organization expenseLess amortization324.32261.21108.103,374.322,911.211,908.101,750.001,274,424.211,072,546.131,315,412.041,671,815.92*319 7511760276057608Current AssetsCash99,239.4632,200.4322,435.2077,708.76Marketable securities69,492.3769,495.4369,498.4969,501.55Commercial paper1,000,000.001,000,000.00900,000.00900,000.00Certificate of deposit300,000.00300,000.00U.S. Treasury billsEmployee loanAccounts receivable29,853.77192,474.10241,281.9983,550.69Accounts receivableunbilled29,283.33Accrued interestreceivable3,323.075,042.914,912.081,407.72Prepaid insurance497.871,947.821,306.72Prepaid rentInventory of work inprocess33,624.1926,289.5814,527.272,101.65Notes receivable lessdiscount48,014.0045,231.6040,184.1037,401.70Foreign tax credits2,599.382,599.38Federal and state taxdepositsCorporate preferredstock1,284,044.731,373,333.431,626,669.661,472,986.79Fixed assetsAutomobilesoffice equipment andfurniture23,413.1124,616.4124,616.4124,709.44Less accumulateddepreciation17,240.0417,679.8518,133.9918,516,276,173.076,936.566,482.426,193.17Other assetsTravel advance1,750.001,750.002,600.002,000.00Organization expenseless amortization1,750.001,750.002,600.002,000.001,291,967.801,382,019.991,635,752.081,481,179.96*320 7611770277057708Current AssetsCash199,801.54 154,609.69 223,302.83 71,383.15 Marketablesecurities69,188.70 69,188.70 116,475.27 115,498.05 Commercial paper199,185.00 699,505.00 Certificateof deposit200,000.00 300,000.00 200,000.00 U.S. Treasurybills147,254.86 177,483.00 Employee loan30,000.00 22,000.00 Accountsreceivable175,061.27 179,923.28 125,677.10 375,962.75 Accountsreceivableunbilled55,224.80 208,380.09 75,564.13 334,265.73 Accrued interestreceivable5,618.00 8,468.64 7,397.07 7,662.82 Prepaid insurance662.55 57.95 (604.48)2,964.06 Prepaid rentInventory ofwork inprocess2,525.00 17,730.21 51,954.97 25,595.57 Notes receivablelessdiscount32,354.20 30,963.00 23,133.10 21,741:90 Foreign taxcreditsFederal andstate taxdepositsCorporate preferredstock48,300.00 48,300.00 739,621.06 1,016,576.72 1,178,682.99 1,924,879.03 Fixed assetsAutomobiles15,640.87 23,661.92 21,610.18 officeequipment andfurniture24,709.44 17,394.97 18,937.66 38,815.93 Less accumulateddepreciation(18,895.73)(8,078.37)(9,541.67)(9,389.41)5,813.71 24,957.47 33,057.91 51,036.70 Other assetsTravel advance2,000.00 2,250.00 2,400.00 2,400.00 Organizationexpenseless amortization2,000.00 2,250.00 2,400.00 2,400.00 747,434.77 1,043,783.89 1,214,140.90 1,978,315.73 *321 LIABILITIES7411750275057508Current LiabilitiesAccount payable76,110.2611,753.6515,822.6271,513.51 Contract deposits270,985.17192,529.47277,544.53261,278.55Federal income tax56,907.2611,894.4438,388.52105,310.76 State income tax5,188.691,434.434,609.0711,229.81 Other taxesAccrued engineering20,926.0013,482.0015,344.0032,390.00 Project prepayment51,500.00Deferred credits4,475.722,886.092,050.32 Accrued payroll tax41.64203.4147.865.38 Accrued compensation& profit sharingcontributions22,400.0045,000.00115,000.00240,184.85 Accrued dividend46,000.00 508,534.74276,297.40469,642.69769,963.18 Stockholders equityCommon stock460,000.00460,000.00460,000.00460,000.00 Paid on capital9,856.909,856.909,856.909,856.90 Retained earnings285,568.75285,568.75285,568.75285,568.75 Net income10,463.8240,778,0890,343.70192,427.09 Dividends paid(46,000.00)Treasury stock765,889.47796,203.73845,769.35901,852.74 1,274,424.211,072,501.131,315,412.041,671,815.92 7511760276057608Current LiabilitiesAccount payables18,122.4013,000.1132,253.6020,256.30 Contract deposits260,000.74218,643.33178,285.5549,745.02 Federal income tax54,726.4843,438.7559,456.8354,896.41 State income tax11,737.194,715.6513,464.1813,188.46 Other taxesAccrued engineering18,530.0022,198.0027,424.0024,450.00 Project prepaymentDeferred credits1,903.473,426.054,601.352,131.80 Accrued payroll tax7.48247.3126.00236.00 Accrued compensation& profit sharingcontributions16,800.0098,000.00225,000.00206,954.62 Accrued dividend55,200.00 361,827.76403,669.20540,511.51427,058.61 Stockholders equityCommon stock460,000.00460,000.00460,000.00460,000.00 Paid on capital9,856.909,856.909,856.909,856.90 Retained earnings431,995.84431,995.84431,995.84431,995.84 Net income8,827.3076,854.91193,387.83207,468.62 Dividends paid(55,200.00)Treasury stock910,140.04978,707.651,095,240.571,054,121.36 1,291,967.801,382,376.851,635,752.081,481,179.97 *322 7611770277057708Current LiabilitiesAccount payables47,731.00 124,241.23 20,923.05 514,651.96 Contract deposits183,108.00 345,885.42 585,849.44 111,771.13 Federal income tax34,792.88 8,812.37 (1,491.90)206,606.45 State income tax14,513.33 119.61 (536.90)18,888.74 Other taxes2,409.20 Accrued engineering26,690.00 26,516.00 21,122.00 36,338.00 Project prepaymentDeferred credits875.00 Accrued payroll tax30.36 1,486.88 321.20 362.51 Accrued compensation& profit sharingcontributions17,316.00 84,417.13 120,231.07 334,312.59 Accrued dividend27,771.15 327,465.77 591,478.64 746,417.96 1,250,702.53 Stockholders equityCommon stock460,000.00 460,000.00 460,000.00 460,000.00 Paid on capital9,856.90 9,856.90 9,856.90 10,169.58 Retained earnings584,264.46 584,264.46 584,264.46 584,264.46 Net income19,848.00 44,258.31 57,295.10 337,066.34 Dividends paid(27,771.15)Treasury stock(654,000.00)(646,074.42)(643,693.52)(636,116.03)419,969.36 452,305.25 467,722.94 727,613.20 747,435.13 1,043,783.89 1,214,140.90 1,978,315.73 *323 Note: Petitioner's balance sheet for its fiscal quarter 7611 (November 30, 1976) reflects the figures in the balance sheet prepared for that quarter by petitioner's outside CPA. The slight discrepancy between total assets and liabilities for this quarter results from the fact that the in-house balance sheet included cents while the outside statement was rounded to even dollars. The above adjustments to petitioner's unaudited balance sheets involve on the asset side decreasing the item of "Inventory of work in process" and on the liability side decreasing the item of "Contract deposits." These decreases are to reflect costs not reimbursed by the client deposits and progress payments, primarily those on foreign contracts, as explained below. Petitioner objects strenuously to respondent's omission of an inventory cycle from his Bardahl-Mead calculation, noting that petitioner in fact purchases and resells equipment. Petitioner's books reflect as an asset item its "Inventory of work in process." This represents equipment, engineering, and other related costs on petitioner's uncompleted contracts. Respondent argues that the omission of the inventory cycle is justified because*324 petitioner's so-called inventory costs are funded through the deposits and progress payments it receives from its clients. We agree with respondent that petitioner's equipment and other related costs on its uncompleted contracts should not be included in an operating cycle calculation to the extent that such costs are met through client deposits and progress payments on such contracts. Petitioner may not reasonably accumulate earnings for working capital to fund costs already paid by its clients. To the extent that petitioner's "Inventory of work in process" account represent costs not reimbursed by the client deposits and progress payments, however, it represents a cost to which petitioner must devote its own working capital. Consequently, we think that to the extent petitioner's "Inventory of work in process" accounts represents its own use of its working capital, it is appropriate to include an "inventory" cycle in determining petitioner's operating cycle. We are unpersuaded by respondent's argument that the clients' deposits on petitioner's uncompleted contracts adequately perform the function of an inventory cycle. We think respondent's argument mixes apples and oranges. *325 The inventory cycle is part of a working cycle determination that attempts to trace a taxpayer's application and recoupment of its working capital. Petitioner's customer deposits on its uncompleted contracts represent a source of funds for its interim costs on its uncompleted contracts, generally reflected as accounts receivable, cash, or other liquid assets. Such deposits do not represent an application of petitioner's working capital and hence do not serve the function of an inventory cycle. Unfortunately, petitioner's books and records do not indicate the extent to which its "Inventory of work in process" account represents its use of its own working capital rather than client deposits. Petitioner reported as an asset item on its quarterly balance sheets the gross amounts of its costs on its uncompleted contracts; it similarly reported as liabilities the gross amounts of customer deposits on the uncompleted contracts. This reporting position is contrary to generally accepted accounting principles. The proper method of reporting these items involves netting on a contract-by-contract basis. The asset item "Costs of uncompleted contracts in excess of related billings"*326 (the description preferred over "Inventory of work in process") properly includes only the sum of the amounts of excess costs incurred over related billings for that group of contracts having excess costs. Likewise, the liability item "Billings on uncompleted contracts in excess of related costs" (e.g., "customer deposits"), properly includes only the sum of the excess of billings over related costs for the group of contracts having excess billings. The separate asset and liability accounts, however, are not netted. See AICPA Accounting Research Bulletin No. 45 (ARB 45). See also Construction Contractors, Audit and Accounting Guide 50-51 (AICPA 1981). Although accounting principles are not conclusive for tax purposes, Thor Power Tool Co. v. Commissioner,435 U.S. 914 (1978), we think that a taxpayer's books and records under the completed contract method of accounting prepared in accordance with ARB 45 will more accurately identify the amount of a taxpayer's excess costs over related billings on its uncompleted contracts, which we think is the proper measure of that taxpayer's "inventory" cycle in making an operating cycle analysis. For petitioner's fiscal quarter*327 ending November 30, 1976, its books and records were audited by an outside CPA in conjunction with petitioner's purchase of Edward Loew's shares pursuant to the 1970 Stock Purchase Agreement. The audited balance sheet, prepared in accordance with ARB 45, showed $2,525 as "Costs of uncompleted contracts in excess of related billings" instead of the $69,662 of "Inventory of work in process" shown on petitioner's unaudited statement. Likewise, the audited balance sheet reported as a liability the amount of $183,108, identified as "Billings on uncompleted contracts in excess of related costs" rather than the $250,245 of "contract deposits" reported on petitioner's unaudited balance sheets. Except for this one quarter, there is no precise way of reconstructing petitioner's unaudited balance sheets under ARB 45 to accurately show the amount of petitioner's excess costs over related billings, which we have determined to be the appropriate starting point for the so-called "inventory" cycle. Nonetheless, in light of the large amount of foreign contracts (about 50 percent) for which petitioner could not obtain progress payments, we are persuaded that petitioner did in fact incur costs on many*328 of its uncompleted contracts in excess of its related billings. Respondent's total omission of this element from the working cycle was erroneous. Accordingly, exercising our best judgment upon the facts of record, we would recast petitioner's books and records to approximate what we think would be the proper reportings under ARB 45. See Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930). Our revision, reported in the above statements of assets and liabilities, also reflects petitioner's expansion of its foreign business after Loew's retirement in November of 1976. Finally, in computing petitioner's basic working capital needs under the working cycle formula, we would have used its peak inventory and accounts receivable figures rather than the average figures used by respondent's revenue agent. Most cases using peak figures have determined the period during which the aggregate of accounts receivable and inventory was the highest, rather than the separate periods during which each figure was highest. See Suwannee Lumber Manufacturing Co. v. Commissioner,T.C. Memo. 1979-477 n. 16 and cases cited therein. The underlying theory for this aggregation*329 is that a peak accounts receivable period will usually follow a peak inventory period, representing a single application of the taxpayer's working capital in a single working cycle, and thus, the aggregation is necessary to prevent double dipping. In determining working capital needs as with the taxpayer's other reasonable business needs, we must allow accumulations that a prudent businessman would consider appropriate for his present and reasonably anticipated future business needs. Sec. 1.537-1(a), Income Tax Regs. Given the fluctuations of petitioner's market, we believe that a prudent businessman in petitioner's position would reasonably accumulate enough working capital to satisfy his peak needs. Moreover, given the long duration of the bulk of petitioner's contracts (14.29 to 21.67 months), we would use separate rather than aggregated peaks for inventory and accounts receivable; this long duration eliminates the double dipping concern. Our determination of petitioner's working capital under the Bardahl-Mead formula for one operating cycle would be as follows: Fiscal YearItem1975197619771. Gross sales/receipts $2,441,583.24$2,539,744.82$3,206,635.282. Peak accounts receivable 723,210.09633,981.77731,970.383. Cost of goods sold 1,564,505.321,557,852.171,716,582.894. Peak "work in process" 63,218.1633,624.1951,954.975. Annual operating expenses 2,170,621.432,228,923.432,652,582.866. Average accounts payable * 103,199.2231,029.18145,443.867. Accounts receivable cycle as percentage of tax year(line 2 divided by line 1).2962054   .2496242   .2282674   8. "Inventory" cycle as per- centage of tax year(line 4 divided by line 3).0404078   .0215837   .0302665   9. Accounts payable cycle as percentage of tax year(line 6 divided by line 5).0475436   .0139212   .0548310   10. Working cycle as percentageof tax year (line 7 plus line8 minus line 9).2891182   .2572867   .2037029   11. Working capital needed forone cycle (rounded)(line 5 times line 10)$ 627,566.00$ 573,472.00$ 540,339.00*330 APPENDIX II We would thus determine net liquid assets as follows: Current Assets197519761977Cash$ 84,460.50$ 77,708.76$ 71,383.15Marketalbe securities119,680.8169,501.55163,798.05Commercial paper800,000.00900,000.00699,505.00Certificates of deposit300,000.00200,000.00Accounts receivable608,744.2783,558.69710,228.481 "Inventory of work in process" 23,335.882,101.6525,595.572 Other current assets 3,164.322,714.4432,626.88Total Current Assets$1,639,385.781,435,585.09$1,903,137.13Current LiabilitiesAccounts payable$ 71,513.51$ 20,256.30$ 514,651.961 "Contract deposits" 261,278.5549,745.02111,771.133 Taxes 116,540.5768,084.87225,495.194 Other current liabilities 320,630.55289,972.42398,784.25Total Current Liabilities$ 769,963.18$ 427,058.61$1,250,702.53Net Liquid Assets (Currentassets minus current$ 869,423.00$1,008,526.00$ 652,435.00liabilities) (Rounded)*331 Footnotes1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩2. As will be discussed in the Opinion below, we conclude that application of the Bardahl-Mead formula for determining petitioner's working capital needs is inappropriate under the facts of this case. Moreover, were we to apply that formula, we would reach a result entirely different from that reached by respondent. If the Bardahl-Mead formula were to be used, then petitioner's balance sheets should be revised to follow generally accepted accounting principles and to correct the errors in petitioner's accounting for its uncompleted contracts that respondent pointed out. We would use peak figures rather than an average of opening and closing figures. Also petitioner did have inventory, and an inventory cycle should have been included in respondent's Bardahl-Mead computation. Thus, were we to apply the Bardahl-Mead↩ formula in this case, we would find that petitioner's working capital needs under that formula would be $627,566, $573,472, and $540,339 for fiscal years 1975, 1976, and 1977, respectively, rather than the $396,837, $285,510, and $85,420 determined by respondent. See Appendix I to this Opinion for such computations and discussion thereof.3. Generally, a distribution in redemption of stock is treated as a distribution of earnings and profits to the extent not properly chargeable to the capital account. Sec. 312(a), (2). Of course, under section 535(c), such distributions do not reduce "accumulated taxable income." The parties have not raised, and we have not addressed, the nettlesome issue presented in GPD, Inc. v. Commissioner,60 T.C. 480 (1973) (Court reviewed), revd. and remanded 508 F. 2d 1076↩ (6th Cir. 1974). There has been no argument in this case that the redemption of Loew's shares reduced petitioner's earnings and profits so that there was no accumulation of earnings in fiscal 1977. Here the issue is whether accumulation of some part of the earnings to fund purchases of stock by the corporation under the 1970 Stock Purchase Agreement was a reasonable business need of the corporation in fiscal 1975 and 1976.4. We will use these same figures. We are aware that if we used the balance sheets as adjusted to reflect generally accepted accounting principles (Footnote 2 and Appendix I to this Opinion), petitioner's available net liquid assets would be somewhat less, namely, $869,423, $1,008,526, and $652,435 for fiscal years 1975, 1976, and 1977, respectively. See Appendix II to this Opinion. Because of the result we reach in this case, we need not recast the balance sheets, particularly since neither party has requested us to do so. This $466,990 figure for working capital for 1976 would be clearly understated. That was the year during which the impasse between Loew and the minority stockholders was at its most critical point. That year there was little new business coming in and petitioner was spending practically nothing to try to obtain new business, hence the exacerbation of the problems between the factions. In this instance the 1.5 ratio is clearly the more reasonable figure and will be used.* The first rate assumes each shareholder was married and filed joint returns; the second assumes each was single. ** This includes Loew's net gain from petitioner's redemption of his shares. *** Tax table income.↩5. Although petitioner submitted a timely statement pursuant to section 534(c), we found the grounds stated therein to be inadequate and accordingly denied petitioner's motion to shift the burden of proof to respondent pursuant to section 534(c)(2). See Rule 142(e). See generally Rutter v. Commissioner,81 T.C. 937↩ (1983) (on appeal 5th Cir. March 8, 1984).6. While petitioner's balance sheets may show high liquidity, we cannot ignore the reasons for maintaining the assets in liquid form. In view of petitioner's business and method of operation, we do not regard the total net liquid assets as unusually large: amounts of $894,660, $1,045,928, and $674,176 for fiscal years 1975, 1976, and 1977, respectively. In any event, the total accumulated earnings and the yearly increases in same are considerably smaller for 1975 and 1976: FiscalAmount ofIncrease OverYearAccumulated EarningsPrior Year1974$285,568.751975431,995.84$146,427.091976584,264.46152,268.621977893,559.65309,295.19While accumulated earnings for 1977 and the increase for that year may seem substantial, the net liquid assets had in fact been substantially reduced that year by the corporation's redemption of Loew's shares for $654,000 in cash (which will be discussed in the text below), and the new controlling management group was cash-starved. The total accumulated earnings shown on the books exceeded the net liquid assets by some $219,383 in fiscal 1977.↩7. See also Wilcox Manufacturing Co. v. Commissioner,T.C. Memo. 1979-92; Farmers and Merchants Investment Co. v. Commissioner,T.C. Memo. 1970-161↩.8. Since Loew received $654,000 under the terms of the 1970 Stock Purchase Agreement for his 60 percent stock interest, the minority would be entitled to $436,000 under that agreement.↩*. The cases uniformly apply an average accounts payable figure in determining the accounts payable cycle, even in those cases where peak inventory and accounts receivable figures are used. We do likewise here. Our average accounts payable for each taxable year is calculated using the quarterly figures reflected in petitioner's in-house balance sheets rather than on the basis of the opening and closing figures used by respondent's revenue agent.↩1. These items use petitioner's labels, but the amounts are revised to reflect our adjustment to petitioner's books and records to follow generally accepted accounting principles, as discussed in Appendix I to this Opinion. ↩2. Employee Loan, accrued interest, and prepaid insurance. It appears that petitioner's asset "notes receivable less discount" was a long-term asset. The only period for which we are able to ascertain the current portion of this long-term asset was petitioner's fiscal quarter ended November 30, 1976. We are unable to ascertain the current portion of any of the periods herein; accordingly, we have excluded the full amounts of the notes. ↩3. Federal income taxes, state income taxes, and other taxes. ↩4. Accrued engineering (e.g., costs on completed contracts) deferred credits, accrued payroll taxes, accrued compensation and profit sharing contributions, and accrued dividends.↩